SHELTON *et al. v.* UNDERWOOD.

(Division A. Oct. 28, 1935.)

[163 So. 828. No. 31858.]

**T. A. Clark** and **J. C. Jourdan, Jr.,** both of Iuka, for appellants.

**W. C. Sweat,** of Corinth, for appellee.

Argued orally by **T. A. Clark**, for appellant, and by **W. C. Sweat**, for appellee.

**Ethridge, P. J.,** delivered the opinion of the court.

J. J. Underwood brought suit against M. P. Shelton and Isaac M. Jackson, and the National Surety Corporation, in the circuit court of Tishomingo county, for assault and unlawful arrest. Shelton was a deputy sheriff, and Jackson was sheriff, of said county, who was bonded by the National Surety Corporation.

The suit was based on the theory that Shelton, the deputy sheriff, assaulted Underwood, the appellee, without cause and arrested him without authority of law, and that appellee was rendered unconscious for a time.

The appellants plead the general issue, with notice of special matter thereunder alleging that Underwood, at the time of the arrest, was violating the law by the use of profane language in a public place.

It appears that the deputy sheriff had arrested another who was drunk and using profane language in a public place, and was carrying this man to prison, and that Underwood and a large number of other persons gathered around the prison, and the prisoner was using vile language, and that Shelton asked the crowd to leave and to go back up town. Underwood and others objected, and there is great conflict in his testimony as to just what happened and what was said during said time. There were numerous witnesses, but few of them agreed with each other exactly as to what was said and done. It seems to have been a case of conglomerate swearing, each witness giving the details of the transaction according to his recollection or his fancy. It will be unnecessary to set out in detail all that was said according to the various parties.

The appellee testified that he went down to the prison because a crowd had congregated there, and there had been some sort of race between the deputy sheriff and the prisoner, and, to quote appellee:

"Q. Had they put him in the calaboose when you got down there? A. Yes, and he was coming away when I walked up, and he said 'You all get away right now, you all go on off.' I was close and he says, 'You too, old man, you too.' I walked off a little piece and he says, 'You haven't got any business down here,' and I says, 'I don't know why, it's a public place.' I says, 'It ain't nothing to you about me being here that I know of,' and he says, 'I will show you,' and grabbed me by the arm and hit me, and that's all I know.

"Q. What do you mean by 'that's all' you know? A. He struck me across the head.

"Q. Where was you when you next knew anything? A. When I was in the doctor's office I found out I was in the doctor's office. . . .

"Q. Do you use profane language? (Objection sustained.)

"Q. When he took hold of you to arrest you, what did

he say he was going to arrest you for? A. I understood him to say for cursing.

"Q. Had you cursed? A. No, sir."

The deputy sheriff testified that he had arrested another person and had placed him in jail, and that a crowd had congregated while he was putting him in, and he asked them to get back, as the prisoner was keeping up a disturbance, and they were talking to him through the bar, and that some of them said something (objection sustained); that Mr. Underwood came and said he wanted to see the prisoner, and walked down and looked in the calaboose, and quoting the deputy sheriff: "I told the balance to get on away, and some of them crowded back up the hill kinder and made out like they were going, but they stopped there, and I looked back over my shoulder and asked Mr. Underwood to come on, let's go, and he asked me if I owned it, and I told him, no, I didn't own a foot of it, but come on so the boy would get quiet, he walked back a few steps above me, and turned round and told me, says 'You are getting God-dam smart here of late,' and I said, 'If that's the way you feel I will have to arrest you for cursing,' and I took his arm and he jerked loose and put his hands back and said, 'You will play hell arresting me,' and I picked the little old pistol and hit him and dropped it on the ground, I picked it up and took him to the door of the calaboose and I saw he was bleeding and I told him I would take him to the doctor, and he said all right."

The appellee is supported by other witnesses, and the deputy sheriff is supported also by other witnesses.

A number of witnesses related what happened, but they differed as to the details. The appellee said that the deputy sheriff said he was arresting him for cursing. Several of the witnesses did not recollect just what was said, but said the appellee used some "byword." Witnesses, both for the appellants and the appellee, disagreed with each other in many material respects as to exactly what was said and done at the time of the arrest. They

also differed as to the force the deputy sheriff used in striking Underwood. The deputy sheriff stated that it was a light blow with a small weapon, and others stated that it was a heavy blow; but it appears that the blow was sufficient to lacerate the flesh and cause the appellee to bleed. There was conflict as to the length of time the appellee was unconscious, he testifying that he was unconscious for thirty-six hours, while the physician attending him testified that the appellee was conscious when he came to his office, and each time he visited the appellee thereafter.

The court submitted the case to the jury upon appropriate instructions, and the jury returned a verdict for the appellants. On motion, the court set aside the verdict, and the cause was thereafter tried on practically the same testimony, except that on the second trial the sheriff testified that he visited the appellee on the night after he was struck, and he was then conscious, and answered his questions in an intelligent and understanding manner. On the second trial, when the evidence was closed, there was a motion for a directed verdict which was sustained by the court as to liability, and submitted the cause to the jury as to damages, and the jury returned a verdict for two hundred fifty dollars, upon which judgment was entered, and from which this appeal is prosecuted.

The setting aside of the verdict on the first trial is assigned as error, as is also the granting of the peremptory instruction in the second trial, and also in respect to certain instructions.

We have carefully read the testimony and have considered the arguments presented, and we are of the opinion that the court was in error in setting aside the verdict on the first trial, and in granting the peremptory on the second trial.

There was sufficient evidence for the jury to find a verdict for the appellants on the first trial, although a greater number of witnesses testified for the appellee's contentions than for the appellants' contentions. As

stated, there was a great difference in the versions as to what happened, even among the appellee's witnesses, and also among the appellants' witnesses; but it was the peculiar function of the jury to find the facts from this conglomerate testimony. Under the law of this state, the jury is selected from among qualified electors, able to read and write, of fair character and sound judgment and good intelligence, and when a jury is so selected and reaches an agreement unanimously on conflicting evidence, their judgment should be allowed to stand.

It is true that the trial judge has the power, under the law, to set aside the jury's verdict when it is against the overwhelming weight of the evidence. The court, in selecting the jury, has to inquire as to their qualifications, and examine them as to their bias or prejudice, or lack of same, and may reject any juror who, in his opinion, is not qualified, and, by statute, counsel have extensive rights to conduct an examination of the jurors. Before the trial court is authorized to set aside the verdict of the jury, there should be such a state of facts as would render the verdict unreasonable, or show that it was the result of bias and prejudice, amounting to corruption.

Where the evidence on one side is cogent and strong by unimpeached and disinterested witnesses, and that on the other side weak and improbable or by interested witnesses, or witnesses whose credibility has been impeached, or who have failed to respond to the evidence, the judge would be authorized in setting aside a verdict; but he must find, from a full consideration of all the evidence, that the verdict is clearly contrary, not to the mere weight of the evidence, but to the *overwhelming* weight of the evidence. It must be such a verdict as would cause an enlightened conscience to shrink at the result. The jury has opportunity to see the witnesses and to judge of their fairness, bias, or prejudice, or lack thereof, and from the whole situation arrive at the truth of the matter. The very value of jury trial consists in the fact that it is a body of twelve men of fair and impartial minds.

It is true the judge has a better knowledge of the rules of evidence, and a better capacity to estimate legal and factual conclusions, than have the jurors; but he cannot substitute his views for that of the jury merely because he feels that the conclusion reached by the jury is wrong. We know that the judge in trying this case, and other judges in this state, are fair and upright men, learned in the law, and only desire to see justice done; but, nevertheless, the jury is an institution which often safeguards the right of litigants. In case a judge shows bias or prejudice, there is no method by which a litigant may eliminate this bias, or get another judge where the judge is not disqualified, for reasons set forth in the Constitution and statutes.

A verdict should only be set aside where it is manifest, from the evidence and surroundings, that it is not a fair and true verdict.

It follows that, for the error indicated, the judgment must be reversed, the former verdict reinstated and judgment rendered thereon for the appellants.

Reversed and rendered.