SANDIFER OIL Co., INC. *v.* DEW, et al.

April 5, 1954

No. 39057     59 Adv. S. 47     71 So. 2d 752

*James A. Blount,* Charleston; *Harold Cox,* Jackson; *Maynard, Fitzgerald & Maynard,* Clarksdale, for appellant.

*George Payne Cossar,* Charleston; *Barnett, Jones & Montgomery,* and *George T. McClintock,* Jackson, for appellees.

618

ARRINGTON, J.

Appellees are the mother, father, brother and sister of Frances Dale Dew, deceased. They brought suit against

Sandifer Oil Company, Inc., and Isaac E. Sayle, d/b/a Sayle Oil Company, for the recovery of damages growing out of the death of Frances Dale Dew. On the verdict of a jury, judgment was entered against Sandifer Oil Company, Inc., in the sum of $85,000.00 after the case had been non-suited as to Sayle, and Sandifer appeals to this Court.

Sayle owned a retail service station in the City of Charleston where he sold gasoline and other products incident to such business. In addition, he owned a wholesale gasoline business and in connection therewith he had six large storage tanks situated to the rear of and on the same premises as his retail station. These storage tanks were mounted on concrete foundations about seven feet high. Two of these tanks were used for the storage of regular gasoline and were near each other. One had a capacity of five thousand gallons and the capacity of the other was ten thousand gallons. A pipe ran from each of these tanks to a point near the ground and these two pipes were connected with a common outlet or inlet, at the end of which was a valve which was kept closed and locked except when gasoline was being put into or taken from one or the other of the tanks. Each of these pipes had a valve between this common outlet or inlet and the tank which it served, so that if the valve on the pipe leading to the ten thousand gallon tank was open and the one on the pipe leading to the five thousand gallon tank was closed, gasoline could be pumped into the ten thousand gallon tank. Likewise, if the valve on the pipe leading to the five thousand gallon tank was open and the one on the pipe leading to the ten thousand gallon tank was closed, gasoline could be pumped into the five thousand gallon tank.

For several years Sayle had been purchasing gasoline from appellant, and on July 23, 1952, appellant's transport truck brought a load of approximately five thousand one hundred gallons of regular gasoline to Charleston to be delivered to Sayle. Sayle was in Arkansas at the time

and had left his employee, Dewberry, in charge of the wholesale business. Boler was an employee of appellant and was the driver of the transport truck. He had had several years experience in this type of work. He drove the transport truck up to a point near the valve through which the gasoline could be pumped into either of the two tanks mentioned. Dewberry unlocked the valve and told Boler that he had to make a trip a few miles out of town and would be gone twenty or thirty minutes. Boler connected a hose to the common valve. The valve leading to the ten thousand gallon tank was open and the one leading to the five thousand gallon tank was closed. As a matter of fact, the five thousand gallon tank was empty and the ten thousand gallon tank already had about seven thousand gallons of gasoline in it. According to appellees' proof, Boler made no inquiry as to which tank would hold the gasoline. It is undisputed that Boler did not measure the contents of either tank as he could have done, and, without any knowledge as to how much more gasoline the ten thousand gallon tank would hold, he started the motor on the truck which operated a pump which forced the gasoline into the ten thousand gallon tank. After checking the connections to see that there were no leaks, he went to a restaurant nearby and drank a cup of coffee and ate a small cake, leaving the motor of the truck running and the pump working, and leaving the same wholly unattended. He was gone for something like twelve to sixteen minutes and returned to the truck. Then in a short time he went to the Sayle retail service station and got a bottle of Coca Cola and was in the station drinking it, leaving the truck motor running and the pump working. Someone passing by saw that the ten thousand gallon tank was overflowing and gave the alarm. Boler ran to the truck and turned the switch so as to stop the motor and the pump. In a minute or so, there was an explosion. According to the proof for appellees, there was a large quantity of

gasoline spilled on the ground to such extent that it formed in puddles. When the explosion occurred, the gasoline ignited and the flames spread rapidly. Frances Dale Dew was passing at the time on an errand for her mother, and the force of the first explosion threw her down into the gasoline and she became a veritable human torch.

The principal point argued by appellant, and the one to which more than half of its brief is devoted, is that the lower court erred in not sustaining its motion for a new trial on the ground that the verdict is so excessive as to evince passion, prejudice and bias on the part of the jury.

The deceased in this case was fourteen years of age. She was well advanced in school, played in the school band and took part in the activities of the school. She was a devout church member, attended Sunday School regularly, and frequently taught one of the Sunday School classes. She was industrious about the home, attentive to her mother and father and her brother and sister, and they enjoyed her society and companionship. As to the extent of her injury, we have not been able to find any case which approaches the horror described in this one. In a moment's time this beautiful young girl was reduced to a charred crisp. This accident occurred at about 9:30 a. m. on July 23. When she was dragged from the flaming gasoline and her clothing torn from her, the cooked flesh literally fell from her body. She was rushed to a hospital where everything known to medical skill was done to alleviate her suffering and to prolong her life when immediate death would perhaps have been more merciful. Approximately ninety per cent of her body was burned and the greater portion of this consisted of second and third degree burns. Over a large area, the skin was destroyed and the flesh cooked. In this condition, she lived until one p. m. on July 27th —a period of ninety-nine and one-half hours. It is undisputed that she was conscious until about eighteen to

twenty-four hours before death. According to the doctors and nurses who attended her, she endured the most intense and excruciating pain. One of the nurses, who was with her con tantly on a twelve-hour shift, said it was the worst case of burns she had ever seen, and that she had attended many of them. She said that deceased's body was badly swollen and that her face swelled until her eyes were closed and she was still conscious and begging for something to be done to relieve the pain; this nurse finally said that she was simply unable to describe the intensity of the suffering.

In the case of Mississippi Central Railroad Co. v. Hardy, 88 Miss. 732, 752-754, 41 So. 505, this Court said: "It was the province of the jury, and the jury alone, to measure in dollars and cents the amount due him for physical and mental anguish, and, unless in a case where the verdict plainly shows that the jury must have been influenced by passion, prejudice or, corruption, this Court never interferes with their finding as to damages . . . This Court has no scale delicate enough to weigh physical and mental anguish. At best it is an extremely difficult task. The law has committed this delicate task to the unbiased judgment of the twelve plain, practical, every-day men who compose the jury, and it can nowhere be more safely rested than in the application of their good sense and hone t judgment to the particular facts proven in each particular case."

One of the elements of damages which the appellees are entitled to recover in this case is that of the pain and suffering endured by the deceased. Here the deceased suffered the most unimaginable pain for something like seventy-five hours. In Belzoni Hardwood Co. v. Cinquimani, 137 Miss. 72, 102 So. 470, the deceased and his wife were estranged and on a previous appeal we had held that $1,500.00 for Cinquimani's death was grossly inadequate and had remanded the case for a trial on the issue of damages alone. That issue was then limited,

on the last trial, to the pain and suffering endured by deceased from the time of his injury until the time of his death. The jury awarded damages in the sum of $10,000.00, and on the second appeal, we affirmed the judgment on condition of a remittitur in the amount of $5,000.00. In that case only six hours elapsed between the time of the injury and the time of the death. The injury occurred between 7 a. m. and 9 a. m. and consisted of a fractured skull. The patient died at 1 p. m. During at least a part of the intervening time he was unconscious. But giving the most liberal view of the evidence as to the length of time the deceased suffered, it could not have exceeded six hours. That case was decided in 1924 and we fixed $5,000.00 as the amount of compensation to be awarded for six hours suffering. By the same token, seventy-five hours of pain and suffering should be compensated for in the amount of $62,500.00, based on the value of the dollar in 1924, and probably twice that amount based on the value of the dollar today. In 1924, men were working for $1.50 to $2.00 per day; today they make more than that in one hour.

■■■ Another element of damages which appellees are entitled to recover is for loss of society and companionship. According to the proof in this case, the deceased had a life expectancy of 51.89 years; her sister had an expectancy of 50.99 years; her brother, 46.44 years; her mother, 31.91 years, and her father, 28.43 years. They all lived in the same home together and were in daily association with each other. We cannot put a value on loss of society and companionship; that is the function of the jury. But here we have a happy household broken by the inexcusable negligence of appellant's employee.

In the case of Gulf & Ship Island R. R. Co. v. Boone, 120 Miss. 632, 82 So. 335, there was involved the amount of damages recoverable for the death of a twenty-one year old soldier, who endured no pain and suffering, whose parents were dead, and who left two brothers and

one sister. It was shown that he had contributed about $20.00 a month to the sister, but the court pointed out that if he had lived and had continued to make such contributions for the entire period of his life expectancy the commuted value of the total contributions would have been only about $3,600.00. The only other element of damage was loss of society and companionship. He was not living with his sister or either of his brothers. The jury rendered a verdict for $30,000.00, and this Court affirmed it on condition of a remittitur in the amount of $10,000.00, thus sanctioning a verdict for approximately $16,400.00 for loss of society and companionship of a young man twenty-one years old who was not living with any of his relatives. That was in 1919 when a dollar was worth more than twice what it is today, and, when the difference in its purchasing power is applied, the Boone case would be authority for a recovery of not less than $35,000.00 today for loss of society and companionship.

■■■ In addition to the elements of damages already discussed, the appellees are entitled to recover for the value of the loss of earnings of the deceased. It has been suggested that this element is worth little if anything, yet it is one which is well recognized under the law and which the jury was entitled to take into consideration. It is worth something or the principle would not be so firmly embedded in our law. We cannot speculate that the deceased would have married and moved off to herself in a few years any more than we can speculate that, in addition to the chores which the evidence shows she did about the home, she may have taken care of her father and mother in their declining years later on. The evidence certainly shows that she was the type of girl who would have done that if the occasion had arisen.

■■■ Moreover, the appellees were entitled under the facts of this case to have the question of punitive damages submitted to the jury and the trial court granted an instruction which did submit the question. We have no way

of knowing what amount of punitive damages, if any, the jury awarded, but they were certainly justified in awarding a substantial amount. We have repeatedly held that the amount of punitive damages to be awarded is solely in the discretion of the jury. For instance, in Yazoo & M. V. R. R. Co. v. Williams, 87 Miss. 344, 355, 30 So. 489, it was said: "It is the long settled and uniformly adhered to rule in our jurisprudence that the amount of such punitory or exemplary damages is solely within the discretion of the jury, and, no matter what the sum of their finding might be, interference therewith, unless for exceptional causes, is discouraged—New Orleans, J. & G. N. R. Co. v. Hurst, 36 Miss. 660 (74 AM. Dec. 785); the reason being that, as the jury are the sole judges of the amount which ought properly to be assessed in order to inflict adequate punishment, the courts should scrupulously avoid any undue interference with their prerogative. This is the rule elsewhere, and is accepted as the sound principle by the most noted text writers. See Sedgwick on Damages, Secs. 388, 1318; Sutherland on Damages, Sec. 1092; Thompson on Trials, Sec. 2065."

The above case was cited with approval in Teche Lines, Inc. v. Pope, 175 Miss. 393, 401, 166 So. 539, in which it was also said: "The verdict was for fifteen thousand dollars. This is a larger amount than any of us would have voted for had we been on the jury. But, as we have often heretofore said, that is not the test. The state of the record is such that had there been no allowance of punitory damages and the verdict had been for half the stated amount as compensatory damages, we would not be authorized to interfere. Assuming therefore, that half, or even more than half, the amount of the verdict represents a punitory award, we are still not authorized to interfere."

In Tri-State Transit Co. of La. v. Worley, 197 Miss. 663, 20 So. 2d 477, we said that where the proof was sufficient to sustain a verdict for $500.00 actual damages,

an additional award of $1,000.00 as punitive damages would not be excessive. In other words, this Court approved in that case a ratio of twice as much punitive damages as the award of actual damages.

When consideration is given to the several items of damage which we have discussed, it will be seen that there is no reasonable basis upon which we would be justified in overriding the judgment based upon the verdict of the jury. Twelve men passed upon it and found the amount awarded to be reasonable. The trial judge who heard and observed all the witnesses was unwilling to say that the jury was motivated by passion and prejudice, and, so the case comes here with the stamp of approval by thirteen men.

But, it is argued that several outside influences entered into the case so as to create a verdict based upon sympathy instead of fact. One of these influences, it is said, is the fact that the suit was originally against Sayle and Sandifer Oil Company, and after the jury had been selected, the plaintiffs took a nonsuit as to Sayle for a consideration of $5,000.00. Even if Sayle were guilty of negligence which proximately contributed to this tragic death, he was only a joint tortfeasor. The plaintiffs had the right in the first instance to have sued Sandifer and left Sayle out of it as a defendant, and by the same token they had the right to enter a nonsuit as to Sayle. Moreover, at the instance of Sandifer, the court instructed the jury that if they should find for the plaintiffs, they must give Sandifer credit for the $5,000.00 paid by Sayle and reduce the amount of damages to that extent. We mention this without deciding whether such an instruction was proper. Furthermore, no objection was made to the entry of a nonsuit as to Sayle, and the matter was raised for the first time in the motion for a new trial.

It is also said that large numbers of school children who were classmates of the deceased attended the

trial, and that this had an undue influence upon the jury. The record shows that no objection whatever was made by appellant against the attendance of school children at the trial until after the verdict and in the motion for a new trial. The matter was never brought to the attention of the trial judge during the course of the trial. He would certainly not have been justified in excluding school children from the courtroom on his own motion, and he cannot be put in error on a matter which was not brought to his attention and on which no action by him was requested.

Complaint is also made that a brother-in-law of the mother of deceased served as one of the bailiffs to the jury from 12:45 p. m. until 2:20 p. m. on the last day of the trial, but it is not contended that during this brief period of service he discussed the case with any member of the jury or in any other manner exercised any influence over any of them.

It is also contended in the motion for a new trial that one member of the jury was friendly toward one of the counsel for the plaintiffs. There is no contention that this fact had any influence on the juror in arriving at a verdict or that counsel exercised or undertook to exercise any influence over him.

In numerous places throughout the briefs for appellant, the statement is made that the verdict in this case puts the appellant on the verge of bankruptcy or insolvency. Such statements are completely outside the record. There is no showing as to the financial worth of appellant. The record does show that appellant was able to promptly make a supersedeas bond for appeal, with a surety company as the surety thereon.

In summary, we may observe that the record in this case is unusually free from even the slightest error. Very few objections were made during the course of the trial and no complaint is made against any ruling of the trial judge thereon. No complaint is made against the

granting of any of appellees' instructions except one to be presently discussed, and no complaint is made as to the refusal of any of the instructions requested by appellant. The record is as clean and free from error as any we have had occasion to review. We know of no basis whereby we could substitute our judgment for that of the jury on the quantum of damages. It is said by appellant that no case has been cited where a verdict for so large an amount has been upheld for the death of a minor child. Each case must necessarily depend upon its own facts, and we have found no case where the damages for the death of a minor have been so aggravated. If this decision sets a new precedent as to the amount of a verdict, it is merely because the damages proven have likewise set a new precedent.

It is further contended that the trial court erred in granting to appellees an instruction which allowed the jury to award punitive damages, because the negligence of Boler was not such as to warrant the imposition of punitive damages and because further, since Boler was only a servant of appellant, no punitive damages should have been awarded against his master. We do not agree with either of these contentions. Under the doctrine of respondeat superior, the master is liable for the acts of his servant which are done in the course of his employment and in furtherance of the master's business. Our reports are so full of cases holding, even where punitive damages have been allowed, and the principle is so firmly embedded in the jurisprudence of this State, that the citation of authorities to support it is wholly unnecessary.

As to whether Boler's negligence was such as to authorize the submission of the question of punitive damages to the jury, we review briefly some of the evidence. Boler testified that Mr. Sayle was usually present when he made deliveries of gasoline and would tell him how much gasoline to put in each tank, but on this day Sayle

was not present and Dewberry had gone before Boler started pumping into the tank. He testified that no one told him how much gasoline was in the tank and that he did not inspect the tank himself to obtain this information. Without knowing how much the tank would hold, he connected his hose and started pumping into the ten thousand gallon tank. He admitted that he was familiar with the rules of the National Fire Protective Association and that these rules provide that the driver of a gasoline transport truck should not leave his vehicle while the tank thereon is being filled or emptied. He also admitted that Sandifer had such a rule and that he was familiar with it. And yet, contrary to what he knew to be the approved method of unloading his tank truck, he left the truck pumping gasoline into the storage tank and went off to a restaurant and drank a cup of coffee and ate a cake, leaving the operation to take care of itself, with no one present to watch it, and, upon his return, he abandoned the job again and went into the filling station and sat down to drink a Coca-Cola. Boler was leaving his truck to pump the highly inflammable and dangerous agency of gasoline into a tank without knowing how much the tank would hold. It is difficult to conceive of a case of more reckless and wanton disregard of the consequences of his act. His negligence was gross, it was reckless, and it was wanton to such extent as to be tantamount to wilfulness. Under Boler's admissions, the jury was warranted in awarding punitive damages in a large and substantial amount. Throughout the length and breadth of this State similar transport trucks are daily traveling our highways and making deliveries of gasoline. ■■ ■■ Those who handle such dangerous agencies should be made to know the standard of care which is required of them. It is regrettable that such a tragic

occurrence is necessary to again bring such knowledge to those engaged in such business.

Affirmed.

*Hall, Lee, Kyle,* and *Holmes, JJ.,* concur.

GILLESPIE, J., concurring in part and dissenting in part:

I concur with the majority on the question of liability as to compensatory and punitive damages. With due deference, I am of the opinion that the verdict is excessive.

The verdict in this case was for $90,000, from which the jury deducted $5,000 paid by Sayle, and assessed the remaining $85,000 against the appellant. The proof showed that the deceased was a girl fourteen years of age, and was a model child of unusually fine traits. She suffered horribly during approximately 75 hours of consciousness, and lived about 99 hours after the injury. Considering all the facts and circumstances of the case, a large verdict was justified, especially in view of the fact that punitive damages were properly allowable.

I recognize the rule that the amount of punitive or exemplary damages is solely within the discretion of the jury and this Court should not interfere therewith unless for exceptional causes. Yazoo R. R. v. Williams, 87 Miss. 344, 39 So. 489. However, in the cases of Alabama R. R. Co. v. Kelly, 126 Miss. 276, 88 So. 707, and Teche Lines, Inc. v. Pope, 175 Miss. 393, 166 So. 539, this Court gave recognition to the rule that in extraordinary cases it should exercise a supervisory power over verdicts that include punitive damages.

The amount of the verdict in this case is without precedent in any American jurisdiction for the death of a child, insofar as it appears from the excellent briefs filed by both sides. In my opinion, this verdict far exceeds the rational total of compensatory and punitive damages. I believe that to a reasonable and objective mind it must be said that the verdict was the result of sympathy, bias, or prejudice. The entire atmosphere of this case was

calculated in all of its aspects to play heavily upon the emotions of the jury.

I am apprehensive that the action of the majority in upholding this verdict, aside from the matter of justice to the particular defendant, will justifiably alarm the citizens of our state and will have a disturbing effect on its commercial and industrial development, which is so vital to the welfare of all of the people. Such observation would not be valid unless based on the belief that the damages far exceed what would justly compensate the plaintiffs and punish the defendant. I think a remittitur should have been ordered.

*McGehee, C. J.,* and *Roberds* and *Ethridge, JJ.,* concur in this opinion.