ILLINOIS CENTRAL R. R. Co. *v.* HARRISON, et ux.

No. 39627　　　　May 16, 1955　　　　80 So. 2d 23

332

*Byrd, Wise & Smith,* Jackson, for appellant.

*Wm. Harold Cox,* Jackson, for appellees.

Gillespie, J.

This case was tried twice. The first trial resulted in a jury verdict and judgment for defendant, appellant here. On motion for new trial, the circuit judge set aside the judgment and granted a new trial. The second trial resulted in a jury verdict and judgment for the plaintiff, appellee here, for damages to appellee's truck. Appellant was granted a special bill of exceptions, to which was attached as an exhibit the entire proceedings and transcript of the first trial. It is conceded by both parties that the evidence on the two trials was substan-

tially the same. The question is whether the lower court erred in setting aside the verdict and judgment in the first trial.

We first state appellant's version of the facts. About two or three miles south of Pickens, Mississippi, on the main line of the Illinois Central Railroad, there is a private crossing east of Highway 51 and west of some tanks maintained by the Interstate Pipeline Company. Appellee sent his truck in charge of a driver, King, and a helper, Thompson, to load and haul some sheet steel purchased from Interstate. This truck consisted of a Chevrolet tractor, to which was attached by means of a fifth wheel a semi-lowboy trailer about thirty feet long. The whole unit was about forty-five or fifty feet long. The semi-lowboy was blue and black; the tractor was yellow.

After appellee's employees had loaded only a part of the steel, about 6,500 pounds, the driver of the truck decided to leave because the nearby creek was rising on account of the rain. As the truck attempted to cross the appellant's track by means of the crossing, it became stuck so that the semi-lowboy trailer was astride the railroad track. The height of the semi-lowboy and the steel loaded thereon was about six feet. King, the driver, lived near the railroad and knew that appellant's southbound train No. 3 would be due within a short time. King and his helper tried to extricate the truck from the crossing by means of a winch, but were unsuccessful. The track was straight with very little grade for several miles to the north. Visibility was bad due to the overcast and rain, and members of the train crew slowed the train north of Pickens so as to interpret the order board at Pickens. North of Pickens, the rain was extremely hard, but south of the town the rain had slackened to some extent. The engineer was looking down the tracks through a clear vision window, which can be raised forward so that the rain is kept out but the engineer can see under it without having to look through

the glass. The fireman was in the left window of the engine of the train and was looking down the tracks. As the train approached the crossing in question, visibility was about 600 to 700 feet; the speed of the train was 35 to 40 miles per hour; the sixteen-car train was pulled by a 2,400 class steam engine. When the train got within 600 or 700 feet of the crossing, the engineer had his hand on the whistle cord blowing the whistle when he saw the appellee's truck on the tracks. The engineer immediately put the train in emergency. After the train had been put in emergency and all was being done that could be done to stop the train, the engineer saw a white man to the west of the tracks against the fence of the right-of-way; and the fireman, who was riding on the east or left side of the engine, saw a colored man jumping up and down on the east side of the tracks some distance east of the railroad. The train had been in emergency for some distance when the fireman saw the colored man and when the engineer saw the man west of the track.

The train had been slowed down to about ten miles an hour when it struck the semi-lowboy and shoved the whole unit the length of the engine, about 65 feet. The truck was shoved against and damaged the railroad signal installations that were located thirty feet south of the crossing. The train made a good stop considering the visibility at the time and place. It was raining at the time of the approach of the train and the collision, but not as hard as it had been further north. It would require 680 feet to stop the train traveling 30 miles per hour, 840 feet at 35 miles per hour, and 1,120 feet when traveling at 40 miles per hour. It was shown by an expert that if the train, which weighed about 1,450 tons, had struck the truck, which weighed overall about 25,000 pounds, without slackening its speed, the train would have been wrecked. It was further shown by an expert that it would have been a physical impossibility to stop the train in 65 feet if it had not slowed down before

striking the truck. Neither the engineer nor the fireman saw the appellee's driver or helper trying to flag the train until the train had been put in emergency for several hundred feet, when King was seen by the engineer west of the right-of-way and Thompson was seen by the fireman on the east side. The accident occurred about 2:30 p. m.

We now state the appellee's version as testified to by appellee's employees, King and Thompson. After working frantically to extricate the truck from the tracks, Thompson saw the train coming, first seeing its headlights, then the train itself. He estimated the train was two miles away when he first saw the headlights. After the train was seen, they worked for two or three minutes trying to winch the truck off the tracks. King saw the train when it was about a half mile away. Both agreed that when the train was about a half mile away, King took his raincoat and Thompson took a pink shirt from the tool box and both ran up the track a distance of 570 feet (Thompson measured it six months later), and tried to flag the train. When the train got close King stepped off the track to the west and Thompson to the east. Neither stated how close the train was when they stepped off the track and went to the side of the right-of-way. King and Thompson both testified that the brakes of the train were not applied until it struck the truck. They both testified that it was not raining when the train came and that there was nothing to keep the engineer from seeing them flagging the train if the engineer had been looking.

The principal argument made here by appellee is that the jury's verdict in the first trial was against the overwhelming weight of the evidence. Several issues of fact were presented to the jury on conflicting testimony: (1) Whether the visibility of the train crew was limited to 600 or 700 feet, as to which the appellant was supported by the engineer, fireman, track supervisor who was riding in the cab of the engine, and the conductor,

whereas their testimony was contradicted by King and Thompson; (2) whether the rain had stopped, as claimed by appellee's two witnesses, or whether it was still raining, as testified by appellant's four crew members; (3) whether appellant's engineer and fireman could have seen King and Thompson attempting to flag the train a sufficient distance to have stopped the train before the collision, as to which appellant relied on the testimony of the engineer and fireman and the appellee on the testimony of King and Thompson; (4) whether the train went into emergency some six or seven hundred feet north of the crossing, as testified by the train crew, strongly supported by the expert who testified that otherwise the train itself would have been wrecked, or whether, as claimed by King and Thompson, the train struck the truck with unslackened speed and without having the brakes applied; (5) whether the engineer was keeping a lookout according to the positive testimony of the engineer and fireman, or whether the train approached the crossing without any train crew member looking where they were going, as contended by appellees; (6) whether the engineer, by the exercise of reasonable care, could have seen the appellee's equipment a sufficient distance away to have stopped the train and avoided the accident.

Under the general verdict for appellant, the jury found against the appellee on all these issues of fact. The jury had a right to believe that appellee's truck driver and helper did not run up the center of the track 570 feet or any other distance trying to flag the train; they may have inferred that the train was so close when they started to flag it that they stayed out near the right-of-way edge fearing the train might wreck and injure them; or the jury may have inferred that King and Thompson stepped off the track before the train got close enough for the engineer or fireman to have seen them under weather conditions then prevailing. But the jury in this case did not have to resort to reasonable inferences, as was their right and privilege. If they believed

the testimony of appellant's witnesses, they could reject the testimony of King and Thompson. The positive and direct proof of appellant's witnesses was ample to support the verdict for appellant.

The issues of fact were for the jury. We know of no reason why the testimony of the train crew should not be believed by a jury. The testimony of the train crew and the appellant's expert witnesses exonerated the railroad company; their testimony was not unreasonable; they were not impeached; and their version of the facts was consistent with the physical facts and the facts of common knowledge. The case was tried with the central issue very clearly expressed in the following instruction requested by appellee and given by the court:

"The court charges the jury for the plaintiffs that under the facts of this case the sole issue is whether or not the engineer of the train could have seen the trailer on the tracks or the two men, the drivers thereof, signaling the train to stop a sufficient distance away to have brought the train to a stop and avoided the accident by the exercise of ordinary care, and if you believe from a preponderance of the evidence that engineer could have seen the trailer on the track or the two men undertaking to signal the train, by the exercise of ordinary care, a sufficient distance away to have brought the train to a stop and avoided the accident, then you will find for the plaintiffs."

██ █ We conclude that the trial court erred in sustaining the motion for a new trial on the ground that the verdict was against the overwhelming weight of the evidence. █ "Before the trial court is authorized to set aside the verdict of the jury, there should be such a state of facts as would render the verdict unreasonable, or show that it was the result of bias and prejudice, amounting to corruption." Shelton, et al. v. Underwood, 174 Miss. 169, 163 So. 828.

 █ "The judge may not substitute his judgment for that of the jury merely because he would have de-

cided the matter differently . . . Conflicts in the testimony and the veracity of witnesses are for the determination of the jury, not the judge.'' Universal Truck Loading Company v. Taylor, et al., 178 Miss. 143, 172 So. 756. Cf. Faulkner v. Middleton, 186 Miss. 356, 190 So. 910; Paine, et al. v. Dimijian, 201 Miss. 522, 29 So. 2d 326; Lynch v. American Slicing Machine Company, 202 Miss. 515, 32 So. 2d 546; Jackson City Lines v. Harkins, 204 Miss. 707, 38 So. 2d 102.

Appellee argues no other question of sufficient merit to warrant a discussion.

Reversed on direct appeal and judgment here for appellant; affirmed on cross-appeal.

*McGehee, C. J.,* and *Hall, Kyle, Holmes, Arrington* and *Ethridge, JJ.,* concur. *Roberds, J.,* took no part. *Lee, J.,* dissents.

LEE, J., dissenting.

A lowboy trailer, 30 feet long, loaded with sheet steel rolled into tanks so that its full height was between 6 and 7 feet, attached to a two-ton heavy duty Chevrolet truck, making an over-all length of 45 or 50 feet, stalled on the crossing. The truck itself had passed entirely over the crossing with the back end about 4 feet from the rail. The cab of the truck was a bulky object and was considerably taller than the loaded trailer.

It was about 2:30 in the afternoon of March 10th. The railroad track was practically level and perfectly straight for a distance of two miles or more north of the crossing. It had been raining hard. However, it was then only misting or raining some — at least it had slacked off. The engineer and fireman on the train were not handicapped by fog, because the glass window was elevated.

According to Lewis King, a white man, and Wesley Thompson, a Negro, the operators of the truck-trailer, when they were unable to extricate it from the crossing

and when they saw the train approaching from about one-half of a mile away, King took his raincoat and Thompson a woman's pink skirt, and both of them ran up the track toward the approaching train for a distance of 570 feet, waving these garments and trying to flag the train. At that point, they stepped off of the track, one on one side, and the other on the other, to keep from being hit by the train.

Both Vinson, the engineer, and Short, the fireman, testified that they were keeping a lookout; that they could have seen a man on the track for 600 to 700 feet ahead; and that they saw no man or men on the track. Vinson testified that as he was blowing the crossing signal, he saw what he thought was a wagon on the crossing. Immediately, he turned the cord loose, put the engine in emergency, and applied the brakes. At that time, he was about 600 or 700 feet north of the crossing. He estimated that he then traveled 200 or 300 feet, which would put him in about 400 feet of the crossing, and, at that point, he saw a white man, about 50 feet west of the track at the right-of-way fence, running toward the truck and flagging down. He then admitted that the distance to the crossing was a mere rough estimate, and likewise as to the distance when he saw the truck. The record of his testimony shows the following: "Q. And you, of course, do not swear to the distance north of the crossing that man was when you passed him in the locomotive? A. No, do not. Q. That is just a rough estimate? A. Yes. Q. The same is true when you say you were six or seven hundred feet north of the crossing when you first saw the truck on the crossing? A. Yes."

Short testified that after the train was in emergency for 200 or 300 feet, which was about 400 feet from the crossing, he saw the Negro man over to his left, jumping up and down, hollering and pointing down the track. Again he said that the Negro was from 400 to 500 feet north of the crossing. But on cross-examination, he ad-

mitted that the Negro could have been 570 feet or more north of the crossing. The record of his testimony shows the following: "Q. And you stated that he was four to five hundred feet north of the crossing? A. Yes, somewhere in there. I saw him after the engineer put the train in emergency. Q. This boy could have been 570 feet north of the crossing? A. He could have. I don't know exactly. Q. Because you don't know exactly what his distance was from the crossing; and in all probability he could have been farther than where you estimate? A. He could have been much farther."

There was no real dispute between Short and Thompson as to where Thompson, the Negro, was as the train was passing — 570 feet north of the crossing. Thompson said that he was flagging as he ran up the track for 570 feet, where he stepped off; and at least he was flagging when Short saw him. If he was flagging then, can anybody believe that he was not flagging as he ran the 570 feet up the track. If he had remained on the track, he would have been killed. His standing on the right of way was not a circumstance from which the jury could validly infer that in flagging the train, he ran up the right of way instead of along the tracks, and thus excuse Short's failure to see him. The record indicates that this Negro was a sensible person. There can be no doubt that his purpose, in going up the track, was to flag the train; and according to the proof, he had gone a distance of 570 feet for that purpose. The photographs in the record show that the tracks in this area are located on a fill. Imagine his running along the drainage ditches immediately after a hard rain to get up the track and flag a train! It is a matter of common knowledge that one flags a train by getting on or near the track. If Thompson ran along the side of the right of way or in the drainage ditches in order to get up the track and flag the train, the human race has never produced a baser idiot.

There is no difference, in fact, between the statements of Vinson and Short as to where the white man and Negro, on different sides of the track, were seen — 570 feet north of the crossing. Now King swore that he also ran up the track 570 feet flagging. He was certainly flagging when Vinson saw him 50 feet from the track by the right-of-way fence. But Vinson said that King was running toward the truck. Is the fact that, at that time, King was standing 50 feet from the track to justify the jury in saying that he must have run that distance on the side of the right of way, because the engineer said he did not see him on the track? Is he also to be branded as an idiot in not knowing how to flag a train, and this, too, in view of the fact that he had lived by the side of the railroad for years?

If Vinson and Short were keeping a lookout, they should have seen both King and Thompson as they ran up the track for a sufficient distance to stop the train before the collision.

A bulky object such as the truck, with its cab, just 4 feet past the rails, with an over-all length of 50 feet had blocked the crossing. If this verdict is permitted to stand, then this Court will be saying that the jury was warranted in finding that, while Vinson and Short were keeping a lookout, King and the Negro, Thompson, must have gone up the side of the right of way to flag the train because Vinson and Short said they did not see them on the track at all. The Court will also be saying that the jury was warranted in finding that Vinson and Short were keeping a lookout and yet they could not see this bulky obstruction on the crossing until they were within 600 or 700 feet — 200 or 233 yards — and this in the daytime, in midafternoon, on a level, straight track.

I think the verdict in the first trial amounted to a miscarriage of justice, and that it was clearly against the great weight of the evidence. Chapman v. Powers, 150 Miss. 687, 116 So. 609; Mobile and O. Railroad Co. v.

Johnson, 165 Miss. 397, 141 So. 581; Fore v. Illinois Central R. Co., 172 Miss. 451, 159 So. 557, 160 So. 903; Universal Truck Loading Co. v. Taylor, 174 Miss. 353, 164 So. 3; Universal Truck Loading Co. v. Taylor, 178 Miss. 143, 172 So. 756; Faulkner v. Middleton, 186 Miss. 355, 190 So. 910; Belk v. Rosamond, 213 Miss. 633, 57 So. 2d 461. In the first trial of Universal Truck Loading Company v. Taylor, supra, it was said to be manifest from the evidence and surroundings that the verdict was not a fair and true verdict.

Many years of experience as a trial lawyer and a circuit judge caused me to develop a profound respect for verdicts of juries. Only in rare instances have I been willing to set one aside. But, perfection on earth has never yet been attained. Even the wisest as well as the best of men sometimes go astray. I think the learned circuit judge was fully warranted in setting aside the verdict of the jury on the first trial, as being against the great weight of the evidence; and that the judgment for the appellee, based on the verdict of the jury in the second trial, should be affirmed.