GIBSON *v.* A. P. LINDSEY, DISTRIBUTOR, INC., et al.

No. 40849 June 9, 1958 103 So. 2d 345

*Crisler, Crisler & Bowling,* Jackson; *Simrall, Aultman & Pope,* Hattiesburg, for appellant.

*Vardaman S. Dunn,* Jackson, for appellees and cross-appellants, *A. P. Lindsey Distributor, Inc.,* and *Carroll C. Westbrook.*

*Vardaman S. Dunn,* Jackson; *Norman B. Gillis, Jr.,* McComb, for appellant and cross-plaintiff, Carroll C. Westbrook.

Lee, J.

Vernon Gibson sued A. P. Lindsey, Distributor, Inc., and its agent, Carroll C. Westbrook, to recover damages for personal injuries sustained by him on account of the alleged negligence of Westbrook in the operation of an automobile of the defendants. The defendants denied the material allegations of the declaration; and Westbrook, by cross-claim, sought to recover from Gibson

damages for personal injuries and property damages on account of the alleged negligence of Gibson in the operation of the truck, which he was driving at the time. Concisely stated, the pleadings presented for determination the issue as to which of the parties, namely, Gibson or Westbrook, was responsible for the collision of the two motor vehicles, with the consequent damage.

The jury returned the following verdicts: "We, the jury, find for the plaintiff, Vernon Gibson, and we assess his damages in the amount of $5,000"; and "We, the jury, find for the cross-defendant, Gibson, on the cross-claim of Westbrook."

The defendants filed separate motions to set aside the verdict and judgment, and for the grant to them of a new trial. The assigned grounds included the refusal of their requested peremptories and certain other instructions; the giving of one particular instruction for the plaintiff; the verdict was against the overwhelming weight of the evidence; and the verdict was excessive.

The court, on the hearing of the motions, held that the verdict was excessive to the extent of $2,500, and granted a new trial on the issue of damages only, unless the plaintiff, within five days, entered a remittitur in that amount. Gibson declined to enter the remittitur and appealed under Section 1536, Code of 1942 Recompiled. Both defendants prosecuted cross-appeals.

About ten o'clock A. M. on October 9, 1956, there was a collision on Highway 98, which runs east and west, about five miles east of McComb, between a gravel truck of the State Highway Department, driven by Gibson, and a Ford automobile, driven by Westbrook.

Gibson had hauled a load of gravel from a point several miles east of the place of collision, and had dumped it on the north shoulder of the 20-foot pavement. He then purposed to make a "U-turn" in order to go back for another load. Several hundred feet west of that point, C. D. Kinnebrew was operating a grader to level gravel

on the shoulder. Between these vehicles, Jesse Carroll was flagging traffic with a two-foot stick to which was attached a piece of bright red cloth, about one-half yard wide.

Gibson testified that he looked in both directions, started his truck in low gear, and was going about five miles an hour; that his front wheels crossed the center line of the highway about one and one-half or two feet, at which time he first saw the automobile, about four hundred feet, away, approaching at a speed of about eighty miles an hour; that he jammed his brakes, and stopped immediately; that there was plenty of room, at least twelve feet, for the car to go around his truck; that it did not stop; and that its left front hit his right front wheel. He knew nothing further as he was rendered unconscious.

C. D. Kinnebrew testified that he was on the grader, and the suction from the car, as it passed him, was so great that, in his opinion, it was going at a speed which he estimated to be eighty miles an hour; that red blinker lights on each side of the grader, visible for fifteen hundred feet, were operating; that, after the collision, the truck was facing north; that Gibson was on the pavement, under the right door, face down, unconscious, with blood running from his nose and the top of his head; that the car had run off the highway on the south side into the fill; that the front wheel of the truck "was just past the center line from the south, the south side of the road", and that he could tell where the wheels spun; that there was a space of twelve or fifteen feet through which the car could have gone around the truck; and that the flagman was somewhere between the grader and the wreck at the time.

Jesse Carroll testified that he was about fifty feet behind the grader when he saw the car "way up the road" and he began flagging it before it got to the grader; that when the wreck occurred, he was about two hundred feet west of the place of the collision; that he tried to

slow down or stop the car by waving his flag up and down, but the driver paid no attention and made no effort to slow down; and that the car was traveling eighty miles an hour.

L. L. Greer, the Maintenance Superintendent for the Highway Department, arrived at the scene ten or fifteen minutes after the collision. At that time, the car was about fifty feet off of the right of way, and had knocked a tree down before it stopped. The point of impact was between "the center line of the road and the quarter point of the south lane." The space south of the collision was between ten and fourteen feet.

Clifton Simmons, a Patrolman, testified that the car went over rough ground two hundred and seven feet from the point of impact. He found debris from the wreck about midway the south lane.

J. E. Carruth, an engineer, testified that both operators should have been able to see for as much as eleven hundred or twelve hundred feet.

Carroll C. Westbrook testified that he was driving at his normal speed of fifty-five to sixty miles an hour. After he came over the crest of the hill, he saw the grader off of the highway and the truck facing west. To him there was no cause for alarm. His lane was open and the other lane was partly open. He said that he had no warning whatever, and that just a few car lengths before he got to the truck, it started out into the highway. He applied his brakes and turned to the right, trying to avoid the truck, but it kept going across the highway, and he could not miss it. He sustained a broken left arm, an injured left leg, two broken teeth, internal bleeding, and damage to his car and its contents.

On this sharply disputed issue of fact, the jury was warranted in finding that Westbrook came over the hill without having his car under control; that he was driving at an unreasonable rate of speed; that he ignored the blinking lights on the grader and the efforts of Carroll to

flag him down; that the truck was stopped; and that, if the car had been under control, Westbrook could have passed around it without any collision.

■■ The overwhelming weight of the evidence therefore demonstrated that Westbrook's negligence was the proximate cause of the collision and resulting injuries. Manifestly, the contention of the appellees that the verdict of the jury was contrary to the great weight of the evidence is wholly untenable.

There was no error, under the evidence in this case, in the appellants' given instruction, about which complaint is made here. Besides, the appellees obtained a number of instructions which cured any defect therein, if such defect in fact existed.

■■ The two verdicts were perfectly clear. They found for the plaintiff, Gibson, on his claim, and against the defendant, Westbrook, on his cross-claim. There is nothing in Section 1483.5, Code of 1942 Recompiled, which would require verdicts any different as to form or substance. They were amply supported by the evidence.

The evidence showed that Gibson was unconscious or semiconscious for two days. He was in the hospital seven days. He was in bed for nine days after leaving the hospital, and was confined to the house two and one-half to three and one-half weeks. He testified that, when he left the hospital, he was suffering from headaches, his eyes were bad, they were ''jumping'', and he could not read. The headaches had persisted once or twice a week, when he got hot, for a period of seven months. He would get dizzy and sick at his stomach; and when he was out in the sun and got hot, his head would hurt, and he would have to stop. He did no work for six weeks after the accident, and thereafter only on the cattle range and the farm. He said that, since the first of the year (January 1957) the headaches had been ''pretty bothering''; that he had dizzy spells pretty often; and that, on the day of the trial, August 1, 1957, he was still having headaches.

Mrs. James C. Leggett, his sister, gave corroboration as to headaches and dizziness, and said that he had had no trouble of that kind before the injury. Mrs. Charles Gibson, a sister-in-law, said that for some time after the injury, Vernon could not drive a car; that in February, before the trial, he was watching TV, when he vomited, had a terrific headache and stumbled out of doors; that on Good Friday, his eyes became crossed and he turned blind; that he developed a bad headache, was nauseated and vomited, and that he fell into a fence. She had never heard him complain of this condition before the injury.

Dr. W. L. Brock examined Gibson in the hospital about an hour after the accident. His diagnosis was a brain concussion—a severe shake-up, which he likened unto seed in a gourd. The swelling of the soft tissue caused the loss of consciousness. When consciousness was restored, the patient complained that his eyes were not focusing, and he so complained when he was discharged from the hospital. The doctor instructed Gibson to stay absolutely at rest. He checked the patient each week or ten days for a period of six weeks. In the doctor's opinion, the recurring headaches and dizziness could have been the result of the injury. He explained that their recurrence is normal over a period of three to six months, and that some victims suffer on that account for as long as twelve months. At the time of the final discharge, he was of the opinion that Gibson could begin doing some work, and he did not think that the injury was permanent.

Gibson's pay with the Highway Department was $40 per week, and his hospital and doctor bills aggregated $576.

The trial judge, in his written opinion, passing on the question of a new trial, observed that the medical expenses amounted to $576 and that the total loss of time for six months would amount to $1,040. However, in view of the doctor's statement, the court thought that the

verdict was excessive without considering any contributory negligence. The final conclusion was: "Therefore, I say in fairness to all concerned I believe the sum of $2500.00 would be fair, reasonable and adequate."

Nowhere did the court find that the amount of the verdict was so large as to shock the enlightened conscience, or that it was unreasonable, or that it appeared to be the result of bias or prejudice, or that it was influenced by passion or corruption, or that, if permitted to stand, it would amount to a manifest miscarriage of justice. It is obvious that the learned judge, insofar as the amount of the award is concerned, simply substituted his judgment for that of the jury.

In Chapman v. Powers, 150 Miss. 687, 116 So. 609, this Court announced the following rule: "The determination of the question whether the verdict of the jury in a given case is the result of passion or prejudice is fraught with much difficulty. *The court in passing upon the question is not authorized to substitute its judgment for that of the jury, for the amount of damage to be awarded is peculiarly within the province of the jury.* But where the award is so excessive, on the one hand, or so inadequate, on the other, as that it is manifest that the jury were unduly influenced in arriving at their verdict, it is the duty of the court to award a new trial upon that ground alone. Putting it differently, if, to let the verdict of the jury stand, it is apparent to the court that there will be a manifest miscarriage of justice, a new trial should be granted." (Emphasis supplied.)

In Shelton, et al. v. Underwood, 174 Miss. 169, 163 So. 828, the Court said: "Before the trial court is authorized to set aside the verdict of the jury, there should be such a state of facts as would render the verdict unreasonable, or show that it was the result of bias and prejudice, amounting to corruption. * * * It must be such a verdict as would cause an enlightened conscience to shrink at the result. The jury has opportunity to see

the witnesses and to judge of their fairness, bias, or prejudice, or lack thereof, and from the whole situation arrive at the truth of the matter. The very value of jury trial consists in the fact that it is a body of twelve men of fair and impartial minds. It is true the judge has a better knowledge of the rules of evidence, and a better capacity to estimate legal and factual conclusions, than have the jurors; but he cannot substitute his views for that of the jury merely because he feels that the conclusion reached by the jury is wrong. We know that the judge in trying this case, and other judges in this state, are fair and upright men, learned in the law, and only desire to see justice done; but, nevertheless, the jury is an institution which often safeguards the right of litigants. In case a judge shows bias or prejudice, there is no method by which a litigant may eliminate this bias, or get another judge where the judge is not disqualified, for reasons set forth in the Constitution and statutes.

■■ ''A verdict should only be set aside where it is manifest, from the evidence and surroundings, that it is not a fair and true verdict.''

In Oliver Bus Lines v. Skaggs, 174 Miss. 201, 164 So. 9, the Court said: ''Appellant assigns and argues that the verdict is too large; so large that it evinces passion and prejudice on the part of the jury. There is often great difficulty for an appellate court to determine this question. Ordinarily a fair-minded jury is more competent than any judge to fix the amount of damages; however, when the amount awarded is so large that it is shocking to the enlightened conscience it is the duty of the court to set it aside and award a new trial on that ground alone.''

In Sandifer Oil Co., Inc. v. Dew, et al., 220 Miss. 609, 71 So. 2d 752, the opinion adopted the following excerpt from the case of Mississippi Central Railroad Company v. Hardy, 88 Miss. 732, 41 So. 505, to wit: ''It was the province of the jury, and the jury alone, to measure in

dollars and cents the amount due him for physical and mental anguish, and, unless in a case where the verdict plainly shows that the jury must have been influenced by passion, prejudice or corruption, this Court never interferes with their finding as to damages . . . This Court has no scale delicate enough to weigh physical and mental anguish. At best it is an extremely difficult task. The law has committed this delicate task to the unbiased judgment of the twelve plain, practical, every-day men who compose the jury, and it can nowhere be more safely rested than in the application of their good sense and honest judgment to the particular facts proven in each particular case.''

In Illinois Central Railroad Company v. Harrison, et al., 224 Miss. 331, 80 So. 2d 23, the opinion cited the first mentioned excerpt from Shelton v. Underwood, supra, and reiterated the principle that: ''The judge may not substitute his judgment for that of the jury merely because he would have decided the matter differently. * * * Conflicts in the testimony and the veracity of witnesses are for the determination of the jury, not the judge'', citing a number of cases.

 It may be conceded that the verdict was large. Of course, $5,000 is a substantial sum of money. But when there is taken into consideration the kind and nature of Gibson's injury, his loss of earnings and medical expenses, and the pain and suffering which the jury had a right to believe that he endured, it must also be conceded that his damage was substantial. Had the verdict come here without diminution, this Court, following the applicable principles, which have been stated above, in its appraisal thereof, would have declined to reduce the amount of the award. The Court is further of the opinion that the trial judge should not have done so, and that he should not have substituted his judgment for that of the jury.

Consequently, on direct appeal, the judgment of the trial court, in ordering a remittitur in the amount of $2,500 is reversed and a judgment will be entered here for the appellant, reinstating the original judgment of $5,000 in his favor, based on the verdict of the jury. On cross-appeal, the judgment is affirmed.

Reversed and judgment here on direct appeal; and affirmed on cross-appeal.

*McGehee, C. J.,* and *Hall, Holmes* and *Ethridge, JJ.,* concur.

## ON SUGGESTIONS OF ERROR

July 3, 1958 104 So. 2d 456

ETHRIDGE, J.

Westbrook and A. P. Lindsey, Distributor, Inc., have filed a suggestion of error as cross-appellants, and Westbrook has filed a separate suggestion of error as a direct appellant from the judgment on his cross-claim. There is no merit in either, so they are overruled. However, in our original opinion no express reference was made to Westbrook's direct appeal with reference to his cross-claim. Hence the Court's judgment is corrected to reflect the disposition of that direct appeal, and the cause is affirmed on both the cross appeals and on the direct appeal of Westbrook. Otherwise, as we have heretofore adjudicated, on the direct appeal of Gibson the case is reversed and judgment rendered here for appellant Gibson.

Suggestions of error overruled, and judgment corrected so as to affirm the direct appeal of Westbrook, as well as the cross-appeal.

*McGehee, C. J.,* and *Hall, Lee,* and *Holmes, JJ.,* concur.