PEEL, et al. *v.* GULF TRANSPORT COMPANY

No. 43440 April 19, 1965 174 So. 2d 377

*Huff, Williams, Gunn, Eppes & Crenshaw,* Meridian, for appellants.

*Snow, Covington, Shows & Watts,* Meridian, for appellee.

RODGERS, J.

This is a personal injury suit for a death claim, growing out of an automobile accident in which a bus collided with a truck while attempting to pass. The jury returned a verdict in favor of the defendant, appellee here, in the Circuit Court of Lauderdale County,

Mississippi, and from an adverse order and judgment overruling appellants' motion for a new trial, the cause has been appealed to this Court. A narrative of the facts here involved are as follows: At or about four o'clock on the morning of December 24, 1963, Harold F. Peel, a young man twenty-one years of age got out of bed at his father's home and went into the yard and started the motor of a 1962 Ford pickup truck parked near his room. He then returned to his room, leaving the motor running, while he finished dressing. He drove to his uncle's restaurant in Quitman, Mississippi, where he was working during the Christmas holidays. After opening the restaurant and performing certain chores, he drove north on Highway 45 two miles to get Olivia Owens, a colored employee. She got in the truck and accompanied Harold Peel as he drove south on Highway 45 to Quitman. He intended to go by the home of Betty Jean Moneghan, another employee of the restaurant, who lived on the east side of Highway 45 on Poplar Street. Highway 45 runs north and south through Quitman, Mississippi. A short distance north of the city limits, the highway goes over a hill and gradually goes downgrade south into the city. The area adjacent to the highway is closely built up with residences, stores and a school. Mr. Peel and Olivia Owens proceeded south along Highway 45 in the pickup truck on the right-hand side of the road until they had reached a point near Owens Body Shop, inside of the corporate limits of Quitman, Mississippi, and within a municipal speed zone of thirty miles per hour. It was then about 5:15 o'clock. The highway at this point is asphalt, "blacktop." The "blacktop" or paved part of the highway is twenty feet wide. The weather was cold and the previous night had been extremely cold. It had snowed but the highway was clear of snow at that time. Harold Peel cleaned the windshield of snow and ice on his side of the truck, but Olivia Owens testified that

she could not see "too good" from her side of the windshield and that Mr. Peel had wiped the inside of the windshield several times as they proceeded south on Highway 45. She testified that she saw the lights of the bus as it came up behind the truck at a time when the truck was in its proper traffic lane. She felt a jar as the bus struck the truck and immediately she saw a "great light." The truck was propelled southward and it caught afire and came to rest in the ditch on the east side of the highway. Harold Peel burned to death, and although Olivia Owens was rescued, she was severely burned.

The bus belonged to the Gulf Transport Company and was being driven by Woodrow Cox. Just prior to the accident, the bus had been used to transport the Mississippi State University Band to the Liberty Bowl game at Philadelphia, Pennsylvania. Herbert J. Mooney had driven the bus back to Birmingham, Alabama, and Woodrow Cox drove to the college and thence south to Quitman, Mississippi. Mr. Mooney rode with Mr. Cox in order to get to his home in Mobile, Alabama, and was on the bus at the time of the collision. Mr. Cox drove south within the corporate limits at a speed testified to be "35 miles per hour or less." Both bus drivers testified that they attempted to pass the truck being driven by Harold Peel on his left, or in the east lane, and just as they were in the process of passing, the truck turned left into the path of the bus. Mr. Mooney called out "look out Bubba", just as the truck collided with the bus and the truck caught afire. The bus driver immediately put on his brakes and brought the bus to a stop, with all of its wheels off the paved portion of the road except the right back wheel. The testimony shows that from the place where the glass from the headlights of the bus was found, to the truck, was a distance of 144 feet; that south from the glass of the headlights to a scraped hole on the east part of

the center line, there was a distance of 21 feet. The skid marks of the bus on the highway, beginning 8 feet and 6 inches from the hole in the pavement to the back wheels of the bus, were 58 feet long. The truck was catapulted 44 feet beyond the bus and thrown upside down. The back wheels of the truck were torn from the truck and thrown to the right on the highway. The left back spring attached to the wheels had asphalt on it.

Many witnesses were produced on both sides. The issues drawn were whether or not the bus driver was violating the speed limit or was otherwise negligent in attempting to pass the truck being driven by Mr. Peel; or whether or not Mr. Peel suddenly turned to the left in the middle of a block because he could not see the road through the windshield, on the theory that it was fogged or iced over. A great many pictures were made exhibits in the record which give a complete pictorial view of the area where the accident occurred, including the vehicles at the place where they came to rest. The back bumper of the truck was introduced and exhibited to the jury. From an examination of the pictures, the accident obviously occurred at or near the center line of the highway. Pictures showing a hole, or scraped place, in the west side of the center line of the highway, were introduced and offered to show that the left spring of the truck was broken and had asphalt on it. The left back wheel of the truck was mashed and had paint from the bus on it. The bus skid marks started close to the center line of the highway. The bus driver testified that he pulled to the left and put on his brakes as soon as he saw that there was going to be an accident. The pictures of the skid marks show that the bus was still near the center line when the brakes were applied. The physical facts and the evidence as a whole are very close.

The evidence offered by the plaintiffs, appellants here, in the trial court presented a claim that the bus

driver for defendant, Gulf Transport Company, was driving at a speed in excess of that permitted in city limits. The declaration charged, among other things, that it was the duty of the defendant's bus driver to give warning of his approach and attempt to pass; that it was his duty to keep his bus under control, and travel at a moderate and reasonable rate of speed, under the then existing circumstances; and to refrain from overtaking and passing the truck until it could be done without interfering with the safe operation of Mr. Peel's pickup truck. Mr. Mooney, who was in the bus at the time of the accident, testified that it was being driven at "35 miles per hour or less"; and later he testified it was traveling from "30 to 35 miles per hour." The bus driver said he was driving "30 to 35 miles or slower", and later, in answer to the question: "So you think it was 35 to 40?", he answered: "Or slower."

The testimony shows that the bus had air brakes, and after the brakes were applied, all wheels laid down dual skid marks a distance of 58 feet long to the back of the back wheels of the 35 foot bus. Thus, it was claimed that the bus with air brakes could not stop in a distance of 93 feet, traveling at 35 miles per hour.

The bus driver testified that as he was approaching the pickup truck from the rear, he could tell the rear glass was iced over. When he proceeded by the truck, he could tell that the left glass was also iced over. In short, it is claimed the bus driver knew the condition of the weather and saw that the back glass of the truck was iced over so that the truck driver's vision was apparently obscured; nevertheless, the bus driver proceeded to pass the truck within the city limits of Quitman at a speed alleged to be greater than is permitted by law, and, obviously at such a speed, he was not able to stop in less than 93 feet.

Defendant bus company, appellee here, was sued by appellants under the wrongful death statute for neg-

ligence in causing the death of Harold F. Peel. It defended upon the grounds that it did nothing to cause the accident, that the accident was caused wholly and solely by Mr. Peel's turning the truck abruptly in front of and striking appellee's bus.

I

This case has been of considerable concern to members of this Court who heard the arguments of counsel, not only because of the importance to the parties involved but because of the close factual circumstances shown by the evidence to have existed at the time of the collision. This is particularly true in determining whether or not the proper issues were submitted to the jury on the question of contributory negligence and "the sole proximate cause" of the collision.

Appellants argue that they should have been granted a peremptory instruction directing the jury to find for them because the testimony of the driver of appellee's bus admitted that he approached the pickup truck driven by Mr. Peel at an alleged unlawful rate of speed "30 to 35 miles per hour" within the city limits of Quitman and that he accelerated the speed of his bus in order to pass the pickup, at a time when he saw and was conscious of the fact that the rear glass of the pickup was iced over. In short, it is claimed appellee's agent was negligent in attempting to pass the pickup truck when he was conscious of the fact that Mr. Peel could not see the bus through the rear glass of the truck as it approached at a rate in excess of the municipal speed limits.

The testimony of Olivia Owens, a passenger in the pickup truck, is to the effect that she knew there was a vehicle behind the truck because, when she first saw the light, they were "far away" and the "lights got closer up to us and next I felt a lick." The bus driver and Mr. Mooney testified that the bus driver blew

his horn and switched his lights on and off before he attempted to pass the pickup truck. There were other witnesses in a place where they could have heard the horn blow but who testified they did not hear it. The bus driver denied having told the Sheriff, Mr. Cooper, that he was driving 40 to 50 miles per hour.

It is the contention of the appellants that since the appellee's witnesses admitted the bus was traveling at 35 to 40 miles per hour and the skid marks laid down by the bus were 58 feet long, and glass was found 21 feet north of the hole in the center of the road, and the truck was thrown 44 feet beyond the bus, or a distance of 144 feet from the point of impact, that the physical facts show that the speed of the bus was excessive, and far above the municipal speed limits. The court submitted the issue to the jury, and, in so doing, granted appellants an instruction informing the jury that the maximum speed limit in Quitman was 30 miles per hour, and also an instruction stating that:

"If you believe from a preponderance of the evidence that Woodrow Cox was operating defendant's bus at a rate of speed that was greater than was reasonable and prudent under the circumstances and conditions just before and at the time of the collision, and decedent's subsequent death, then such an act would be negligence."

Thus, the first question to determine is whether or not the trial court should have granted appellants a peremptory instruction on the issue of the negligence of appellee. We are of the opinion that the trial court was correct in submitting the factual issue to the jury. In the multitudinous activities of life wherein, of necessity, men and their doings, property and other interests come into contact, one who acts as a prudent and careful man would act under like or similar circumstances, may avoid liability to another for such injury. But, where one carries on his activity negligently, so as to cause

injury to another, he is liable in damages because of his carelessness. The law of this State does not recognize contributory negligence as a bar to an action for an injury. If two men are negligent together, and from their joint negligence an injury is caused to one of them, he may maintain an action against the other, but the amount of damages ordinarily due for such an injury will be diminished by the jury in proportion to the amount of negligence attributable to the person injured, or property destroyed. Miss. Code Ann. § 1454 (1956). On the other hand — if one is negligent, and the other is not, and the injury is brought about entirely by one, through no fault of the other, the person free from negligence cannot be charged with damages brought about solely by the negligence of the other person.

It may be said as a maxim of the law of negligence, that the law looks at the proximate and not the remote cause of an injury. Out of this rule of law grows the liability or nonliability of one charged with injury because of negligence. Unless the alleged negligence of the agent of appellee proximately contributed to the cause of the injury of which appellants complain, there can be no recovery. The question to be determined in every case, where negligence is charged, is: Did the defendant's act or omission proximately contribute to the cause of the injury or damage, and were they a lack of ordinary care, or a mere condition of the injury? The connection of the act, or omission, must be a natural and unbroken sequence — without an intervening, efficient cause — so that but for the negligence of the defendant contributing to the proximate cause, the injury would not have occurred. The act must be the immediate and efficient, contributing cause of the injury.

If it is admitted that the testimony preponderates in favor of appellant, it is nevertheless a general rule of law that the trial jury is the judge of the weight and worth of the evidence, and the trial court should

not grant a peremptory instruction where facts bearing on the issue are in dispute, and the evidence offers room for a reasonable difference of opinion. Martin v. Illinois Cent. R. R., 246 Miss. 102, 149 So. 2d 344 (1963); New Orleans & N. E. R. R. v. Thornton, 247 Miss. 616, 156 So. 2d 598 (1963): New Orleans & N. E. R. R. v. Burney, 248 Miss. 290, 159 So. 2d 85 (1963); Triangle Amusement Company v. Benigno, 35 So. 2d 454 (Miss. 1948); Caldwell v. Smith, 200 Miss. 711, 28 So. 2d 657 (1947). Moreover, under our statutory law all questions of negligence and contributory negligence are questions for the jury. Miss. Code Ann. § 1455 (1956).

██ ■ We are of the opinion that the testimony of the witnesses as to the circumstances surrounding the parties at the time of the collision, including the physical facts, taken together, are of such a nature as to present a jury issue on the negligence of the bus driver and the speed of the bus. The court did not err therefore in refusing the peremptory instruction requested by appellants. Devereaux v. General Electric Co., 5 Utah 2d 433, 304 P. 2d 375 (1956); Brown v. Perkins, 144 So. 176 (La. 1932).

## II

Appellants complain of the following instruction granted to appellee by the court:

"The Court instructs the jury for defendant that if the driver of a motor vehicle is, by a sudden emergency or unusual or unexpected occurrence not caused by his own negligence, placed in a position of imminent peril to himself or to another, without sufficient time in which to decide with certainty the best course to pursue, he is not held to the same accuracy of judgment as would be required of him under ordinary circumstances; and if, after such an emergency arises a driver uses care as a reasonable prudent and capable driver would use under the same circum-

stances, he is not liable for any resulting injuries or death, even though a different course of conduct on his part might have been wiser and better.''

This instruction embodies the sudden emergency doctrine, and it is argued that it was erroneously granted because the appellee bus driver had not used due care, and if a sudden emergency had occurred, it was caused by his own negligence in operating the bus at an unlawful rate of speed and in pressing to pass after he was aware of the ''iced over'' condition of the rear glass of decedent's truck.

It is true as a general rule of law that:

''. . . to warrant or require the giving of an instruction on the rule of sudden emergency in motor vehicle accident cases, there must be evidence to support a finding that the claimed emergency existed, that it was not created or contributed to by the negligence or wrongful conduct of the person confronted, and that in meeting the emergency such person acted as a reasonably prudent person would or might have acted in the same or a similar situation.''

8 Am. Jur. 2d *Automobiles and Highway Traffic* § 1030 (1963), at p. 588. Majure v. Herrington, 243 Miss. 692, 139 So. 2d 635 (1962); 38 Am. Jur. *Negligence* § 41 (1941). Factual examples may be found in Evans Motor Freight Lines v. Fleming, 184 Miss. 808, 185 So. 821 (1939) and Hammond v. Morris, 126 So. 906 (Miss. 1930).

This Court has repeatedly held that a defendant is not entitled to invoke the sudden emergency rule as a defense in an emergency created or contributed to by the negligence or wrongful conduct of the person claiming the benefit of the rule. Hinton v. Delcher Bros. Moving & Storage Co., 250 Miss. 535, 160 So. 2d 694; Gregory v. Thompson, 248 Miss. 431, 160 So. 2d 195 (1964); Pullin v. Nabors, 240 Miss. 864, 128 So. 2d 117 (1961); Bellere v. Madsen, 114 So. 2d 619 (Fla.

1959); Moore v. Taggart, 233 Miss. 389, 102 So. 2d 333 (1958); Fink v. East Miss. Electric Power Ass'n, 234 Miss. 221, 105 So. 2d 548 (1958); Rivers v. Turner, 223 Miss. 673, 78 So. 2d 903 (1955); Callaway v. Haddad, 226 Miss. 177, 83 So. 2d 825 (1955); Jones v. Dixie Greyhound Lines, Inc., 211 Miss. 34, 50 So. 2d 905 (1951); Vann v. Tankersly, 164 Miss. 748, 145 So. 642 (1933).

██ ■ The requirement that the person offering the sudden emergency rule as a defense must be free of negligence or fault is, however, a question for the jury where there is a disputed issue of fact. Majure v. Herrington, 243 Miss. 692, 139 So. 2d 635 (1962); Babbitt Motor Vehicle Law § 1491 (4th Ed. 1933).

In the case of Jones v. Dixie Greyhound Lines, Inc., 211 Miss. 34, 50 So. 2d 902 (1951), we said:

"Prosser, Torts (1941) pp. 242-243 is even more definite: 'The "emergency" doctrine is applied only where the situation which arises is sudden and unexpected, and such as to deprive the actor of all opportunity for deliberation. Furthermore, it obviously cannot serve to excuse the actor when the emergency has been created through his own negligence, since he cannot be permitted to shield himself behind a situation resulting from his own fault.' Where there is a legitimate issue of fact, as here, as to whether the driver's own tortious conduct caused the emergency, a negative finding on that issue must exist before the diminished standard of care of an emergency can be applied. For these reasons Instruction Number 5 for appellee was misleading, clearly erroneous, and prejudicial, and does not come within the rule that other instructions may cure an erroneous one. 53 Am. Jur., Trial, Secs. 836-838." (50 So. 2d at pp. 906-907.)

Moreover, the instruction granted the defendant on the emergency doctrine, in the instant case, neither defines nor describes the emergency as is required by the former

opinions of this Court. Cipriani v. Miller, 248 Miss. 672, 160 So. 2d 87 (1964); Kettle v. Musser's Potato Chips, Inc., 249 Miss. 212, 162 So. 2d 243; Gulf, M. & O. R. v. Withers, 247 Miss. 123, 154 So. 2d 157 (1963); Pullin v. Nabors, 240 Miss. 864, 128 So. 2d 117 (1961); Carlisle v. Cobb Bros. Const. Co., Inc., 238 Miss. 681, 119 So. 2d 918 (1960); Annot. 80 A. L. R. 2d 5, 22-30 (1961).

There is, however, another instruction granted defendants which does describe the emergency, and since the instructions are to be read together, the fact that the foregoing instruction on the emergency doctrine does not describe the emergency, though error, it would be harmless error if a sudden emergency instruction were applicable in the case at bar. Crump v. Brown, 246 Miss. 631, 151 So. 2d 822 (1963).

On the other hand, we are of the opinion that a sudden emergency instruction should not have been granted under the facts in this case.

The testimony of the bus driver and Mr. Mooney is to the effect that Mr. Peel suddenly turned his truck into the east lane of the highway just as the bus driver attempted to pass. It is claimed that the bus driver put on his brakes as soon as possible and stopped the bus immediately. Mr. Cox and Mr. Mooney testified that the bus driver did everything a prudent and careful driver should have done under like or similar circumstances. The doctrine of sudden emergency is a legal defense to an alleged failure to use due care. It is in the nature of a confession and avoidance. It is the rule of expedient action under compulsion and stress of impending danger. It is a confession of having done acts, or having failed to perform a duty, which, under ordinary circumstances, would have constituted negligence, but which done or omitted under the stress of sudden peril were in fact acts or omissions of a reasonably prudent man acting under the same or similar circum-

stances. In order to invoke the doctrine of sudden emergency, it must appear that there was a time after the discovery of the impending peril, in which the party charged might have made a choice as to his course of action, and if having chosen one or two alternatives, although his "snap judgment" or instant decision, may not have been proper had the party had time to carefully consider and deliberate upon a proper course to pursue; nevertheless, if he afterwards pursues the course a reasonably prudent person would have pursued under a similar danger, he would not be held to the same strict accountability legally required under ordinary circumstances. This is true because the decision and course pursued was made under excitement, fear and bewilderment engendered by the impending danger, so as to have affected his judgment.

■■■ The sudden peril rule is not applicable where the party who seeks to invoke the protection of the rule has no acts or omissions to explain or excuse, because he had no choice of alternatives. Most accidents happen suddenly and are sudden emergencies, but the sudden emergency doctrine under the law of negligence is not available as a defense in all negligent actions merely because there is an impending danger at the time of the accident. The doctrine is only available to explain why a party should not be held to the same strict accountability of ordinary care required of a reasonably prudent person acting under ordinary circumstances.

■■■ The doctrine of sudden emergency is not available as a defense of one who is solely or partially to blame for causing the emergency. It follows that the doctrine is not available as a defense to acts of negligence, originating prior to the sudden emergency and which directly contributed to the cause of the accident. Therefore, where the negligent acts of two persons precipitate an emergency followed by an accident, and one

of the parties is injured as a direct result of the prior act of negligence of both, the other party is liable in damages to the injured party in proportion to his acts of negligence which contributed to the accident under the same rule as if the injury were caused by his negligence without an intervening emergency. Cf. Gregory v. Thompson, 248 Miss. 431, 160 So. 2d 195 (1964); 8 Am. Jur. 2d *Automobiles and Highway Traffic* § 1030 (1963); Annot. 80 A. L. R. 2d 14 (1961); 65 C. J. S. *Negligence* § 123 at pp. 733-736, Notes 92-95 at p. 736 (1950); Babbitt Motor Vehicle Law § 1474 at p. 1052 § 1488 at p. 1064 (4th Ed. 1933); 38 Am. Jur. *Negligence* § 41 (1941).

██ ██ In the instant case, the granting of the emergency instruction was erroneous. It raises an inference that if Mr. Peel suddenly turned his truck across the center line into the east lane at a time when the bus was about to pass, then and in that event, the appellee was not guilty of contributory negligence in driving at an unlawful speed, and approaching the truck at an unreasonable rate in an unreasonable manner. Blashfield Cyclopedia of Automobile Law and Practice, Vol. 10 § 6745 Note 56 at p. 541. This case must therefore be reversed for a new trial.

### III

There are four other assignments of error that should be discussed in order that errors may not be repeated upon a new trial.

██ ██ Appellants complained that the following instruction granted to defendant is erroneous and prejudicial because the italicized words are peremptory in nature.

"The Court instructs the jury for defendant that the driver of a motor vehicle of any kind has the right under the law to overtake and to pass a preceding vehicle, *regardless of the fact the vision of the driver*

*of the preceding vehicle is lessened or obscured,* provided that the driver of the following vehicle uses ordinary care and further *provided he does not know that, for any reason, the vision of the driver of the preceding vehicle has been obscured,* and provided further that the driver of the following vehicle, in the use of ordinary care, *does not learn that the vision of the preceding driver has been obscured until it is too late to avoid acts of the driver of the preceding vehicle.''*

This instruction assumes as a fact that the deceased driver could not see from the truck because the driver of the bus saw the side glasses were iced over. Moreover, the instruction leaves the inference with the jury that the driver of the bus did not know that the vision of the truck driver was obscured until it was too late to avoid the acts of the deceased truck driver. This instruction was erroneous: First, because the driver testified that he knew the back glass of the truck was iced over at the time he approached from behind. Second, it was the duty of the bus driver under the surrounding circumstances — whether conditions below freezing and iced-over glasses — to foresee and anticipate that the driver of the truck probably could not see the center line of the highway when the lights of the passing vehicle reflected on the frosted glasses, and therefore it was his duty to operate the bus as he approached the truck at such speed and in such manner as a reasonable and prudent driver would have done, observing and considering the surrounding conditions. The bus driver did not have the right under the law to overtake and pass the preceding vehicle, regardless of the fact that the vision of the driver of the preceding vehicle was lessened or obscured when the bus driver observed conditions that would cause a reasonably prudent driver to proceed with caution. The pertinent part of Mississippi Code Annotated section 8185 (1956) is in the following language:

"(a) No vehicle shall be driven to the left side of the center of the roadway in overtaking and passing another vehicle proceeding in the same direction unless such left side is clearly visible and is free of oncoming traffic for a sufficient distance ahead to permit such overtaking and passing to be completely made without interfering with the safe operation of any vehicle approaching from the opposite direction *or any vehicle overtaken.*" (Emphasis supplied.)

The general rule of negligence based upon foreseeability is expressed by the textwriter in 7 Am. Jur. 2d *Automobiles and Highway Traffic* section 221 (1963) in the following language at pp. 770-771:

"When vehicles are proceeding along a highway or street in the same direction, there is no rule of law that compels one to travel behind the other or gives one the unqualified right to precede the other, but rather, the traveler in the rear position may, at a proper place, pass another vehicle whenever he may do so in safety. The law of the road is that an overtaking motorist must see to it that the conditions are such that an attempt to pass an overtaken motorist is reasonably safe and prudent, and he may not overtake and pass the motorist ahead unless he has reason to believe that the road is clear of obstacles which might obstruct his passage. If there is not sufficient room for a safe passage, the overtaking motorist should not attempt to pass, but should wait until a place is reached where a safe passage may be had, and if, after turning out to pass, the overtaking motorist finds conditions to be such that he cannot make the passage in safety, he should either stop or else drop back to his original position to the rear of the overtaken motorist."

"Statutes generally require motorists to give way to the right in favor of overtaking motorists so as to allow them free passage to the left. Such provisions

do not contemplate or permit reckless driving of a fast motor vehicle, whereby slower ones are wrongfully crowded or their operators frightened off the road. Neither do such statutes require motorists to keep a lookout for motorists approaching from the rear, and a motorist, even though his vehicle is slow-moving, is not bound to know at his peril that another motorist is desirous of passing.''

In Blashfield Cyclopedia of Automobile Law and Practice Vol. 2 section 937 (1935), it is said:

''Although the driver of an automobile in turning to the left to pass a vehicle in front of him is not an insurer so as to be liable for all damages resulting regardless of negligence, he is bound to exercise that degree of prudence and caution commensurate with the circumstances, including a consideration of the character and high power of the machine he is driving; and it is his duty to have his car under such control that, under ordinary circumstances, he would not collide with the overtaken vehicle. . . .

''The standard of ordinary care to which the passing driver must conform will not become great care *unless the circumstances present a case of more than ordinary danger in passing,* and whether the circumstances do or do not reveal unusual danger will ordinarily be a question for the jury. Whether or not the over-taking motorist exercised the proper degree of care is usually held to be a question of fact for the jury to decide.'' (Emphasis supplied.)

Professor Prosser on Torts (3rd Ed 1955) has this to say at pp 138-140:

''There are many situations in which the hypothetical reasonable man would be expected to anticipate and guard against the conduct of others. . . .

''But beyond this, he is required to realize that there will be a certain amount of negligence in the world. In general, where the risk is relatively slight, he is

free to proceed upon the assumption that other people will exercise proper care. It would not be easy to move traffic if motorists could not assume that other cars will keep to the right, and drive accordingly. But when the risk becomes a serious one, either because the threatened harm is great, or because there is an especial likelihood that it will occur, reasonable care may demand precautions against 'that occasional negligence which is one of the ordinary incidents of human life and therefore to be anticipated.' 'It is not due care to depend upon the exercise of care by another when such reliance is accompanied by obvious danger.' Thus an automobile driver may not proceed blindly across a railway track, upon the assumption that any approaching train will sound bell and whistle, or into an intersection in the confidence that other vehicles will yield the right of way. . . .

"The duty to take precautions against the negligence of others arises, of course, only where a reasonable man would recognize the existence of an unreasonable risk."

In the case of Williams v. Moses, 234 Miss. 453, 106 So. 2d 45 (1958), this Court quoted from the case of Ulmer v. Pistole, 115 Miss. at p. 492, 76 So. at p. 524 (1917), as follows:

"But this is not all. Recognizing in the motor vehicle an instrumentality equally as dangerous in many respects as the locomotive and trolly car, the law exacts additional precautions from operators. The driver of an automobile must keep his machine constantly under control; he must continue on the alert for pedestrians and others using the streets, and must anticipate their presence. To assume that the way is clear is not his right. The fact that he was unaware of the presence of others in no way extenuates conduct which would have been wantonly reckless, had he known that another person or vehicle was crossing his path-

way. Especially must he expect and look out for other vehicles and persons at such places as street intersections and corners, shopping centers, and other familiar places by and through which the main currents of the population habitually pass. It is his duty, and the great majority of city traffic regulations so prescribe, to slow down at street intersections, in order that possible accidents and collisions may be foreseen and averted.''

■■ ■■ In the instant case, the defendant's bus driver was passing through Quitman, Mississippi, at a speed which he admitted could have been in excess of the city speed limits, and certainly at a speed in which it was impossible to stop with air brakes on all wheels within the distance of the length of fifty-eight feet skid marks, plus thirty-five feet, the length of the bus. We are therefore of the opinion that under the physical facts in evidence and the admissions of the bus driver that he could have been exceeding the speed limit, it was erroneous to instruct the jury that the bus driver could pass the truck *regardless* of the surrounding circumstances, if he did not know of the condition of the glasses on the truck because these instructions tell the jury appellee was not guilty of contributory negligence, regardless of the known surrounding circumstances and his duty to foresee the danger and to proceed with caution at a speed in which he could control the operation of the bus.

■■ ■■ This is particularly true in view of the fact that the court granted another instruction to the defendant in which it was said:

''The Court instructs the jury for the defendant that defendant can not be held for negligence in this case because Mr. Cox attempted to pass the pickup truck at the particular time and place, even if you believe from the evidence that the windshield or the side glasses of the pickup truck were fogged up or iced

over, if you believe from the evidence that Mr. Cox, while exercising ordinary care to see, did not see or know of the condition of the glass until the pickup truck was in the act of turning or driving to its left, if it did turn or veer to its left and into the left lane of the highway, and defendant can not be held liable for attempting to pass the truck, even though glass of the cab of the truck was iced over and the vision of its driver was obscured by the condition of said glass and by reason thereof did not see defendant's bus.''

The positive testimony of Mr. Cox is that he saw that the back glass of the truck was iced over as he approached the truck from the rear. These two instructions are erroneous and harmful and should not be given upon a retrial of this case.

## IV.

Appellants complain of the following instruction:

''The court instructs the jury for the defendant that it was the duty of Mr. Peel in driving his truck south on Highway 45, to keep a vigilant lookout not only ahead but to the sides of his moving truck and to be alert for other vehicles using the highway at the same time; that Mr. Peel was bound to anticipate and expect the presence of other vehicles travelling upon that highway at the same time he was, including those that might be going in the same direction and that might be passing his truck; that Mr. Peel is presumed to have seen what he should have seen and that which was readily visible in the exercise of reasonable diligence. If Mr. Peel failed to perform any of the duties set forth above, he was guilty of negligence and if you believe from the evidence that such negligence, if any, was the sole proximate cause of the accident and the death of the deceased, it will be your duty to find for the defendant.''

This instruction requires a vigilant lookout on the part of deceased. This is a higher degree of care than

the law places upon a motorist traveling upon the high-way. We had occasion to point this out in Graves v. Hamilton, 184 Miss. 239, 184 So. 56 (1938). We drew a distinction in that case between vigilant caution and or-dinary care. This distinction was recognized and re-affirmed in the recent case of Harvey v. Bush, 252 Miss. 326, 173 So. 2d 125.

 The theory of defendant is that Harold Peel turned his truck to the left and into the path of the bus just as it was in the process of passing. Therefore the jury should not have been instructed regarding duties of deceased to look ahead and to both sides since such duty could not have been a proximate cause of the col-lision. Obviously the bus was not beside the truck at the time it was alleged the truck turned to the left. The instructions to look ahead, to look to the sides, to anticipate the presence of others, and failure to see what he should have seen is negligence, was confusing to the jury.

The foregoing instruction was erroneous and should not be granted upon a retrial.

V

 During the trial of the case, and at a time when the jury was out of the courtroom, the appellee offered to show that Mr. Mooney and Mr. Cox were examined some five or six hours after the accident in order to determine whether or not they had been drink-ing intoxicating liquors. The defense objected to this matter being presented to the jury and the court sus-tained the objection relating to the test made in Mobile. The evidence with reference to the test was therefore not presented to the jury by appellants. The defendant Bus Company, however, introduced two witnesses to show that this test for intoxication was made in Mobile by a police officer. The test was made approximately eight hours after the accident and was too remote. Blashfield Cyclopedia of Automobile Law and Practice

Vol. 9 § 6176 (1941). Moreover, since appellants were not permitted to ask the witness on cross-examination about the test because of the objection of defendant Gulf Transport Company, it was foreclosed from introducing testimony which was rejected because of its objection.

## VI

It is next contended by appellants that the trial court committed reversible error in permitting, over appellants' objection, appellee's counsel to repeatedly read to the jury an isolated portion of the unproved testimony of the witness Olivia Owens. A special bill of exceptions was taken to the argument or summation of appellee's counsel, in which the appellants recorded their objection to this conduct in reading from portions of the transcribed testimony. The court reporter did not testify nor was she called during the trial to verify the transcript before the jury. The bill of exceptions shows that the objection to the argument was overruled and appellants claim here that the action of the court in refusing to sustain the objection, and the refusal of the court to grant a mistrial, were prejudicial errors requiring a reversal of the judgment.

There are a great many inherent powers of a trial court, and among these is the power and duty to see that the privilege of argument is not abused. Overing v. Skremetta, 218 Miss. 648, 67 So. 2d 606 (1953).

■■ ■■ We have reached the conclusion from an examination of the authorities that the trial court may, within its sound discretion, permit counsel to read a transcript of a stenographer's notes in argument to the jury.

In the textbook Law and Tactics in Jury Trials by Francis X. Busch, Vol. 5, § 666 (1963), the author points out at p. 518:

"Improper argument; reading from a purported shorthand transcript of the evidence. — While a majority

of the courts hold that it is within the discretion of the court to permit counsel to read from a purported shorthand transcript of the record, other cases hold, and, it is submitted, with the better reason, that such a procedure is objectionable. The ground of the objection is that there is no evidence that the particular transcript is a correct one, and there can be no presumption that it is.''

It has been held that an attorney may, in the presence of the jury, refer to a supposed transcript of the evidence to refresh his recollection, and state that refreshed recollection to the jury.

Where a transcript of the evidence given upon a former trial has been received in evidence for the purpose of impeachment, it is proper, in arguing discrepancies between the testimony given in the former trial and the present one, to read from such transcript. Western Tube Co. v. Polobinski, 192 Ill. 113, 61 N. E. 451 (1901); Bradley v. City of Spickardsville, 90 Mo. App. 416 (1901); Gwaltney v. Scottish Carolina Timber & Land Co., Ltd., 115 N. C. 579, 20 S. E. 465 (1894). See also MacLean v. City and County of San Francisco, 151 Cal. App. 2d 133, 311 P. 2d 158 (1957); Floen v. Sund, 255 Minn. 211, 96 N. W. 2d 563 (1959); Randall v. Steelman, 294 S. W. 2d 588 (Mo. App. 1956); Gephart v. Stout, 11 Wash. 2d 184, 118 P. 2d 801 (1941); Smith v. Northern Pac. Ry. Co., 79 Wash. 448, 140 P. 685 (1914); 64 C. J. *Trial* § 275 (1933).

 In holding that it is within the sound discretion of the trial court to permit the reading of a portion of a court reporter's transcript to the jury, we do so with the firm belief that the trial judges of Mississippi will require proper decorum and will exercise judicial restraint.

The judgment of the lower court will be reversed and the case remanded for a new trial.

Reversed and remanded.

*Kyle, P. J., and Ethridge, Gillespie and Patterson, JJ.,* concur.