369 So.2d 486 (1979)
John H. McGEE et al.
v.
Wilburn L. BOLEN.
No. 50831.
Supreme Court of Mississippi.
March 21, 1979.
*487 Parsons & Matthews, Thomas M. Matthews, Jr., Wiggins, for appellants.
Bryant & Stennis, Grier J. Gregory, Gulfport, Williams S. Murphy, Lucedale, for appellee.
Before SMITH, P.J., and SUGG and COFER, JJ.
COFER, Justice, for the Court:
The cause, a suit for damages for the wrongful death of a child, in the Circuit Court of George County, terminated in a jury verdict for the defendant Wilburn L. Bolen, from which the parents of the deceased child, John H. McGee, et ux., suing on behalf of themselves and the child's minor brothers, have taken this appeal. They assign several errors, among them being the court's failure peremptorily to instruct the jury to find for the plaintiffs. Concluding that this assignment is well taken, we do not reach a discussion of the other errors assigned.
Plaintiff parents and all three of their children, residents of Stone County, had gone on the morning of December 5, 1976, to visit plaintiff Mr. McGee's sister, Mrs. Slade, and her family residing in George County south of Lucedale. After their lunch, the parents and their hostess, Mrs. Slade, left to go to the Pascagoula River to return Mrs. Slade's husband, who was fishing there. They left the McGee children, including Jeremy, whose wrongful death is the subject matter of this suit, and two of the Slades' children, with an older sister of the Slade children, Charlotte Elizabeth Ford, who was then thirteen years of age.
On that date, December 5, 1976, Jeremy McGee was about four and a half years old and his brothers Brian and Clay, were five years old and between seven and eight years old, respectively. They had a foster brother, Chuck Boone McGee, who was eleven years of age.
The Slades' younger children, Kevin, Randy, and Kelly appear from the record to be of ages comparable to the McGee children.
As Charlotte was doing some house cleaning, Chuck, being also in the residence, the children had been playing in the yard area of the house, but moved down to, or to the edge of, Highway No. 63, described as a very busy highway about fifty feet from the Slade residence.
*488 The area of the highway in front of the Slade residence is in a valley between downward slopes, south from Lucedale and north from Pascagoula.
It may be said at the threshold that appellee's driving experience, the safe condition of his tires and brakes, that the day of the accident was sunny, and that the highway was dry, are matters which are established by the uncontradicted evidence. That the paved portion of highway 63 is twenty-two feet wide and the shoulder of the highway, though varying in width, is around ten feet wide are facts likewise well established.
Appellee, with his mother in the passenger side, came southward over the crest of the hill about a half a mile from where the children were located. At his first observation of the children, he was not exceeding the fifty-five mile per hour speed limit, but, by means of brakes or other deceleration, he reduced the speed of the car to twenty-five miles per hour about a quarter of a mile north of the children, and thenceforth maintained that speed until he struck the child, Jeremy, applying his brakes about fifteen or twenty feet before the impact, and laying down skid marks approximately six feet in length. The child's body was knocked by the impact approximately fourteen feet to the front and left of the point of impact and his shoes were found off his feet.
As appellee had come over the hill and they saw the children beside the road, his mother said to him, "Wilburn, there is little children on the side of the road; whatever you do, you be careful," and, every now and then afterward, she would say to him, "Wilburn, be careful, son, whatever you do."
Appellee said that, of the several children, three or four in number, on the right (driver's) side of the highway, two were standing on the shoulder about a foot from the pavement of the highway, (elsewhere he had them two feet from the highway), and there was another child down the embankment from the pavement. He described these children as being a little girl about eleven years old, one little boy about eight or nine years of age, and the child down the embankment, a boy, was about seven or eight years of age.
There were two children, according to appellee, on the east shoulder of the highway, about nine or ten years of age and "maybe six" years old, and they were about two feet from the edge of the pavement and were almost directly across the highway from the children discussed in the paragraph next above.
He saw the children on his left side of the highway when he was about a quarter-mile away from them and, from then on, the children on both sides never passed from his view.
As appellee's car approached, the small girl on the right side held out her hand in front of the child next to her as if to restrain him from entering the road. As appellee approached the site from the north, one Chambers was driving an automobile northward and the two cars (the latter traveling thirty to thirty-five miles per hour) met and passed each other, one to two car lengths north of where the impact took place.
We come directly to Jeremy. Appellee, as an adverse witness, testified that the child suddenly darted out in the road, first seen by appellee when he was eight or nine feet of the center line on the edge of the highway (shown above to be twenty-two feet wide), and that he was about one foot from the center line when he was hit, the impact being at the left headlight of the vehicle, which was burst by the blow. He testified he fully applied his brakes the instant he saw the child and he made no effort to steer to the right or to the left. There was nothing to obstruct appellee's vision, it was winter, and the road shoulders were bare. He testified that the shoulder dropped off in a deep bank, but he could see the child he earlier testified to seeing, down the embankment. He further testified:
Q. Mr. Bolen, I believe you previously stated that you assumed the children would let you pass? Is that correct?

*489 A. Yes, sir. As I approached them, the little girl took and put her right arm in front of the little boy that was by her.
Q. And you assumed at that time that the children would let you pass?
A. Yes, sir.
Q. You, therefore, did not further decrease your speed?
A. No, sir.
Q. You did not apply the brakes when you saw her stick out her hand?
A. No, sir.
Q. You did not apply your brakes until you saw the child, for the first time, in the paved portion of the road? Answer yes or no.
A. Could you repeat the question?
Q. You did not apply your brakes until you saw the child standing in the paved portion of the road?
A. Fully, yes; that's when I applied them fully.
Q. But you did not decrease your speed until you applied your brakes fully?
A. Yes, sir.
Later he testified as a part of his defense case. Asked on direct examination to tell again how the occurrence happened, he said:
A... . As I crested the hill at Hudson's Store, I saw the children along the road playing. So I began to slow my car down. And as I got near the children... I was going 50 whenever I was coming down that hill, so I slowed my car down to about 25. Whenever I got within distance of the children, I saw the little girl that was standing by the road with the little boy. I saw her put her hand out in front of him. And I kept going at the same pace. And as I passed them, that's when this little child darted out.
Q. All right, did you put on your brakes?
A. When the child darted out?
Q. Yes, sir.
A. Yes, sir.
Q. Did you hit the child?
A. Yes, sir, I did.
Q. Do you know where the child came from?
A. No, sir, I do not.
Q... . How many children did you see on the right hand side of the highway?
A. I saw three.
* * * * * *
Q. Did you see the boy you hit?
A. No, sir, I did not.
Q. When did you first see the boy you hit?
A. Whenever he darted out to go across the road.
* * * * * *
A. Did I see the child I hit?
Q. Yes, sir.
A. No, sir, not until he darted out.
Q. When you say he darted out, which way was he going?
A. As you go south, he was going from my right to my left.
Q. All right, that would have been from the ...
A... . west to east.
* * * * * *
Q. In relation to the pavement edge of the road on your right, where was Jeremy when you first saw him? Was he on the pavement portion?
A. He was on the outer portion.
Q. Of the paved highway?
A. Yes, sir.
Q. What was he doing when you first saw him?
A. He was darting, as I said, from right to left.
* * * * * *
Q. All right. Now as you approached the children, let's try to pinpoint my question. After you have left Hudson's Store, you are going down the road .. . right along side of Hudson's Store there. You are heading south. How fast are you going?
A. I was going 25.
Q. Was your foot on the gas pedal or was your foot on the brake pedal?

*490 A. It was on the brake.
Q. Was it all the way on the brake pedal?
A. No, sir, it was not fully applied.
Q. Why was your foot on the brake pedal?
A. So if I had to make a sudden stop I could.
On cross examination, this exchange took place.
Q. You said you didn't see Jeremy, the child that was killed?
A. No, sir, I did not.
Q. Why didn't you see the child?
A. I don't know.
Q. Was there anything that obstructed your vision from seeing the child?
A. No, sir.
* * * * * *
Q. The child Jeremy McGee ... the child that was killed you said when you first saw him he was standing in the paved portion of the road?
A. Yes, sir.
Q. At this location?
A. Yes, sir.
Q. And he was running across the road over to the other side?
A. Yes, sir.
Q. Is there anything that could have obstructed your vision from either seeing the child up on the raised shoulder of the road or down in this swell that goes off to the side.
A. No, sir.
Q. You keep using the words, "the child darted out," and it leaves me with the impression that the child darted out from behind something. But, in reality there was nothing there for him to dart out from behind was there?
A. Yes, sir, he could have darted out from behind one of the other children.
Q. If he was there, then he was there with the other children?
A. Yes, sir.
Appellee's mother, Mrs. Voncille Bolen, testified that as they came to the top of the hill north of the fatal accident scene, she saw two children on the left side of the road and three children nearly about up the right side of the road and then, further on down, there was another one. As to Jeremy, she said:
A. Well, as we began a slowing down and we passed the little children  all that was seen. And where this young child appeared up from, I don't know. But I said, "Oh, God, Wilburn, where did this child come from?" And just about the time we passed them  maybe a foot or a little bit less  he darted out ahead of us.
Q. All right, had you seen that particular child at any time?
A. No, sir, I sure hadn't.
Q. All right, you saw the other children you have testified to?
A. Yes, sir.
Q. But this one you did not see?
A. No, sir.
Q. All right, let me ask you this. Could this child have been behind some of the other children there?
A. Well, he could have and we might not have seen him?
* * * * * *
Q. You did not see this child?
A. No, sir.
* * * * * *
Q. All right. How far was he in front of the automobile when you first saw him?
A. Well, he was only just right on it. We didn't have time to blink an eye or to have done nothing to avoid it.
On cross examination, she gave answers as follows:
Q. Now the three that you saw on the right side, how close were they to the hard surface of the road?
A. Well, they was pretty good, because the little girl was going this a way to mean for them to keep back because they could get hit.

*491 Q. How far was the little girl from where the little boy was that got hit?
A. Well, they was about I would say two feet from him.
Q. The little boy that got hit was with the little girl, right?
A. Yes, sir.
Q. What would you estimate Wilburn's speed at the time the car struck the child?
A. I would imagine about 25.
Q. Mrs. Bolen, was there anything in the way that kept you from seeing the child that ran into the highway?
A. Well, I just can't imagine where he come from because we had seen them others and we didn't see his appearance until he darted out in the road. I said, "Oh, God, Wilburn, where did he come from?"
Q. But he was one of the two or three that you saw there?
A. No, sir he just appeared up all at once.
* * * * * *
Q. How far was he in the road when you first saw him?
A. Well, he was about to the right hand car lights, and before we could make an escape to keep from hitting him, he was all the way to the left hand light.
Q. And he had moved from the right hand light to the left hand light  he had moved that far before the car struck him?
A. Yes, sir. It seemed like he had made an attempt to dart across the road to them little children on the other side of the road.
Q. Do you know whether or not the child was looking at the car you were in?
A. No, sir, I don't.
The driver of the northbound vehicle, Willie Chambers, testified for appellee. He saw the children as he headed northward down the long slope about three-fourths of a mile away and they were then running back and forth across the highway, but as he drew nearer some were on one side and some on the other.
A. They was  I seen two standing close to a mailbox to my left. And a little small one that was back there somewhere.
Q. You saw a small one?
A. Yes, a little small kid.
Q. What was he doing? Standing up, laying down or what?
A. The other ones were across the highway. It looked like he was trying to duck or hide or something.
Q. All right. So he was not up on the shoulder; he was on the embankment. Is that what you tell us?
A. Yes, sir.
Q. And he was a small child?
A. Yes.
Q. Do you reckon his head was up even with the top of the bank, or could you tell?
A. Well, I could see his head the way I was coming. I could see it.
* * * * * *
Q. All right, did you observe anything there at that particular time?
A. Yes, when I passed I looked over to the side of the road and glanced. That's when Mr. Bolen's taillights come on, and I seen the little kid shooting and flying over. I turned around and went back.
Shown a photograph in evidence (Exhibit 6(b) of plaintiff), the witness pointed to a place where he answered that the child was lying down, "trying to hide or something. Trying to duck from the rocks or whatever they were throwing." Then his attention was called to what appeared to be some bushes, and the witness did not remember observing them, but he answered that it was "between those two clumps of bushes" is where he was playing. An examination of this exhibit reveals that the road shoulder, the drainage area alongside the road, and a further space lay between these clumps of small bushes and the highway pavement.
*492 On cross examination he said the child was not "flat out" but was squatting, not behind any trees, right down under the hill, appeared to be ducking from something being thrown at him; he guessed the child was four or five feet from the paved road. He said the child was right next to the mailbox appearing in the exhibit. He could testify to seeing only two children on the west side, the little child being one of them.
Thus, it is seen that there is no material conflict to be resolved by the jury on the issue of negligence. The eye witness testimony was all given by appellee and his witnesses.
The uncontradicted proof is that appellee saw this group of children more than a quarter of a mile before he reached them, and from then they were never out of his sight before the tragic impact with Jeremy. In ample time and space before he reached them he reduced his speed to twenty-five miles per hour which speed he maintained until the instant he saw Jeremy and then in the next instant as he hit the child, he skidded his wheels for approximately six feet. While there was no proof that he saw Jeremy until the matter of seconds before he struck him, Jeremy was one of the group of children alongside the road. To make more serious still the burden that was upon appellee, in the midst of these children some on one side of the highway and some on the other side, and them about two feet only from the paved portion of the busy highway, appellee was forced to meet a vehicle in the northbound lane, thereby further restricting his space of maneuvering his vehicle.
Speed is a relative thing. Under some circumstances, a reduction of speed to twenty-five miles per hour seems a snail's pace speed has been launched upon. In other cases, the present being one, it becomes very fast, too fast. Appellee assumed these children would give him a clear path. This assumption proved error and, in addition, was an assumption constituting a luxury to which he was not entitled. Moak v. Black, 230 Miss. 337, 92 So.2d 845 (1957).
In 1917, when motor vehicles were scarce, this Court said in Ulmer v. Pistole, 115 Miss. 485, 76 So. 522 (1917):
Recognizing in the motor vehicle an instrumentality equally as dangerous in many respects as the locomotive and trolley car, the law exacts additional precautions from operators. The driver of an automobile must keep his machine constantly under control; he must continue on the alert for pedestrians and others using the streets, and must anticipate their presence. To assume that the way is clear is not his right. The fact that he was unaware of the presence of others in no way extenuates conduct which would have been wantonly reckless, had he known that another person or vehicle was crossing his pathway. (Emphasis added).
(115 Miss. at 492, 76 So. at 524).
This legal principle pronounced in the earlier days of automobiles has been cited a number of times since. It was noticed and quoted in Williams v. Moses, 234 Miss. 453, 106 So.2d 45 (1958), and we took note of this fact, and quoted the same from the Williams case, in Peel v. Gulf Transport Co., 252 Miss. 979, 821-22, 174 So.2d 377, 388 (1965).
Our jurisprudence, as reflected in decisions presently herein to be noticed, is that drivers of automobiles are charged with the duty to expect children to do the unexpected, to understand that they may do the ununderstandable and unpredictable, and will act upon a second's impulse. Appellee drove under this responsibility, and had he discharged the duty he owed to those he acknowledges he knew to be at the threshold of the lane on which he was advancing, it follows that this care toward them would have avoided the sad catastrophe reflected in the record. The facts here remove this case from those protecting the motorist from liability for injury to children suddenly darting from behind obstructions of view into the path of the driver. Although not himself visible to appellee he was among those who were visible to him and was entitled to the stern care and caution that belonged to those clearly within appellee's view.
*493 This Court, in Avery v. Collins, 171 Miss. 636, 157 So. 695 (1934), recognized the law in the following language:
It was the duty of the driver of the automobile in this case to keep to his right. As soon as he observed the pedestrian walking on that side, with his back to the automobile, it was the duty of the driver to sound his horn, and to continue at short and frequent intervals to sound the horn until he observed that the pedestrian had become aware of the approach of the automobile. And, when it was observed that the pedestrian continued unaware, it was the duty of the driver to apply his brakes and to slow down, and to come to a stop, if necessary, before the pedestrian was reached. There was adequate time and opportunity within the [one hundred fifty] to [one hundred seventy-five] feet mentioned for the driver to have met all the requirements above stated and thus to have avoided the injury or rendered it improbable, and no case of sudden emergency is presented by the facts.
(171 Miss. at 645, 157 So. at 697).
It is thus that it was the driver's duty, if necessary, to come to a full stop, in protecting the pedestrian.
In McMinn v. Lilly, 215 Miss. 193, 205, 60 So.2d 603, 609 (1952), the pronouncement next above from the Avery case came under review, and was cited with approval, and we observed that it had also received this Court's approval in Stevenson v. Robinson, 37 So.2d 568 (Miss. 1948).
Then in Moak v. Black, supra, both the Avery and McMinn cases were noticed and followed.
Questions of negligence are for the jury's determination. Mississippi Code Annotated, section 11-7-17 (1972). Where, however, there is no issue of fact, then the court determines the negligence question.
In Mercy Regional Medical Center v. Doiron, 348 So.2d 243 (Miss. 1977), it is said: "There was no conflict in the evidence so the issue of negligence was for the court." (348 So.2d at 244). In that decision, Paymaster Oil Mill Co. v. Mitchell, 319 So.2d 652 (Miss. 1975); City of Greenville v. Laury, 172 Miss. 118, 159 So. 121 (1935); and Supreme Instruments Corp. v. Lehr, 190 Miss. 600, 199 So. 294 (Sugg. of Error Sustained), 1 So.2d 242 (1941) are cited and the following language is quoted from the Laury opinion.
In an action at law based on negligence, the question of negligence vel non is for the determination of the jury, unless the doing of the act which caused the injury complained of is not in dispute or conclusively appears from the evidence, and no inference except that of negligence or of no negligence can be justly drawn therefrom, in which event the question is for the determination of the trial judge (Citations omitted).
(172 Miss. at 122, 159 So. at 122).
Appellee sets out the ingredients of the test, if such there is, which must be present before a peremptory instruction may be granted, as follows:
The court is required to look only to the testimony given on behalf of the party against whom the peremptory instruction is requested, and taking that testimony or evidence as true together with all reasonable inferences which could be drawn from the evidence favorable to the prevailing party (against whom the peremptory instruction was requested) and can then decide if a verdict for the party would be sustained; if so, then, the trial court properly refused a peremptory instruction.
Accepting appellee's test as governing this case, it is our opinion that the peremptory instruction requested should have been granted, there being according to our view no issue or question as to appellee's negligence calling for determination of a jury.
The case is reversed and judgment here rendered in favor of appellants on appellee's liability and remanded for a new trial on the issue of damages only.
REVERSED AND RENDERED AS TO LIABILITY AND REMANDED FOR TRIAL AS TO DAMAGES.
*494 PATTERSON, C.J., and SUGG, LEE and BOWLING, JJ., concur.
ROBERTSON, P.J., and WALKER and BROOM, JJ., dissent.
SMITH, P.J., dissents in part.
ROBERTSON, Presiding Justice, dissenting:
I am unable to agree with the majority that the judgment for Defendant Bolen, based on a jury verdict, not only should be reversed but also that a peremptory instruction on liability should be granted the plaintiffs.
The plaintiffs' case was based solely on negligence. In their declaration, the plaintiffs alleged that the 22-year-old driver was negligent: in not maintaining a proper lookout, in not keeping his car under control, in not reducing his speed sufficiently under the circumstances, and in not foreseeing possible danger. The plaintiffs charged that defendant's negligence was the sole proximate cause of the accident.
I differ with the majority wherein they say that "there is no issue of fact" to be decided by the jury, that as a matter of law the defendant is liable. I think that this was a classic case for the jury, and that we are substituting our judgment for that of the jury.
Mississippi Code Annotated section 11-7-17 (1972) provides:
"All questions of negligence and contributory negligence shall be for the jury to determine."
We are violating one of our most time-honored and cardinal rules of appellate review when we ignore all the testimony and reasonable inferences to be drawn therefrom supporting the jury verdict, and substitute our judgment for that of the jury on questions of negligence.
In Shelton v. Coleman, 323 So.2d 90 (Miss. 1975), we said:
"In order to overrule a jury verdict we have held that this Court must find it was contrary to the overwhelming weight of the evidence and not a product of reason, but, rather, the result of bias, passion and prejudice. Phillips v. Dow Chemical Co., 247 Miss. 293, 151 So.2d 199 (1963).
"The rule was stated in Illinois Central Railroad Co. v. Harrison, 224 Miss. 331, 80 So.2d 23 (1955), as follows:
`The judge may not substitute his judgment for that of the jury merely because he would have decided the matter differently... . Conflicts in the testimony and the veracity of witnesses are for the determination of the jury, not the judge.' 224 Miss. at 338-39, 80 So.2d at 26." 323 So.2d at 91 (Emphasis added).
In Gulf Oil Corporation v. Turner, 235 So.2d 464 (Miss. 1970), this Court said:
"With regard to deciding a case as a matter of law which necessitates a finding that the evidence was insufficient to establish a jury issue, the oft-announced rule is that this Court must view the evidence in the light most favorable to the party in whose favor the jury returned the verdict. We must consider as true all evidence favorable to the successful party and assume that the jury drew every permissible inference in reaching its verdict. All conflicts in the evidence are resolved in favor of the prevailing party and this Court may not consider any evidence favorable to the other party except that which is uncontradicted." 235 So.2d at 466. (Emphasis added).
See also: Sprayberry v. Blount, 336 So.2d 1289 (Miss. 1976); Hubbard v. Morris, 275 So.2d 858 (Miss. 1973); Maness v. Illinois Central Railroad Co., 271 So.2d 418 (Miss. 1972); McCollum v. Randolph, 220 So.2d 310 (Miss. 1969); Spell v. Ruff, 217 So.2d 7 (Miss. 1968); Southern Pine Superior Stud Corp. v. Herring, 207 So.2d 632 (Miss. 1968); Dendy v. City of Pascagoula, 193 So.2d 559 (Miss. 1967).
The undisputed and uncontradicted testimony of the driver, defendant Bolen, and his mother, Voncille Bolen, a front seat passenger, was that they were proceeding south on busy state highway 63, shortly after noon on Sunday, December 5, 1976. *495 As they crested a hill about 1/2 mile from the scene of the accident, they saw three children playing on the right side of the highway, and two children on the left side of the highway. Bolen slowed his car from 50 miles to 25 miles per hour, and proceeded cautiously, watching the children on both sides of the highway and also an approaching car going north. Willie Chambers, the driver of the northbound car, testified that he noticed some children on both sides of the highway; that he slowed his car to about 35 miles per hour at the time he passed Bolen going south. His testimony was that they passed about one or two car lengths north of the accident scene. Chambers looked in his rearview mirror and saw Bolen's brake lights go on.
Mrs. Voncille Bolen testified:
"A Well, as we began a slowing down and we passed the little children  all that was seen. And where this young child appeared up from, I don't know. But I said, `Oh, God, Wilburn, where did this child come from?' And just about the time we passed them  maybe a foot or a little bit less  he darted out ahead of us.
Q All right, had you seen that particular child at any time?
A No, sir, I sure hadn't.
.....
Q You did not see this child?
A No, sir.
Q Now, were you looking down the road and paying attention to that that was in front of you?
A I sure was. And ever now and then I would say, `Wilburn, be careful, son, whatever you do'.
Q Was he careful?
A Yes, sir.
Q Do you know about how fast he was driving when you first saw the children until he slowed down?
A Well, he was about 40 or 45; approximately that. And then as we got closer to them, he commenced a slowing down to about 20 or 25.
.....
Q This child  as you approached you did not see him as I understand you?
A No, not until he had darted out in the road.
Q All right. How far was he in front of the automobile when you first saw him?
A Well, he was only just right on it. We didn't have time to blink an eye or to have done nothing to avoid it."
In the majority opinion, contrary to our long-standing and oft-repeated rule of appellate review, all of the testimony supporting the jury's verdict is ignored, and then from the vantage point of hindsight and the opportunity for cool deliberation in our cloistered chambers, we reach the studied conclusion that 25 miles per hour was too fast, and that defendant Bolen should have expected "children to do the unexpected, to understand that they may do the un-understandable and unpredictable, and will act upon a second's impulse." It was Bolen's duty, according to the majority, "if necessary, to come to a full stop, in protecting the pedestrian."
The testimony was that four-year-old Jeremy was a very small child, and, according to witness Chambers coming from the opposite direction, was squatting down and attempting to hide from the other children. The pictures introduced into evidence show an embankment very close to the paved highway, and Chambers said Jeremy was on the embankment, not the shoulder of the highway.
Bolen and his mother testified that Jeremy could have suddenly darted from behind the other children in an attempt to cross the highway.
In other "darting child" cases, this Court has consistently ruled that it was a question for the jury and we have heretofore affirmed the jury's verdict whether it be for the plaintiff or defendant.
In McMinn et al. v. Lilly, 215 Miss. 193, 60 So.2d 603 (1952), a 9-year-old bicycle rider was hit from the rear by a truck driven by defendant. After a full trial, the jury brought in a verdict for the plaintiff and this Court affirmed. In McMinn, we said:

*496 "This rule does not impose liability if the motorist had used all reasonable precautions to avoid an accident and the sudden act of the child creates an emergency rendering it impossible for the motorist to avoid hitting the child, the accident in such case is said to be unavoidable and there is no liability. But in the instant case the facts presented an issue for the jury as to whether or not the truck driver had used all reasonable precautions to avoid the accident and whether any sudden act of the child had created an emergency such as to render it impossible for the motorist to avoid hitting the child." 215 Miss. at 204, 60 So.2d at 608. [Emphasis added].
In Gordon, Minor, by Next Friend, v. Carr, 226 Miss. 836, 85 So.2d 490 (1956), a jury verdict for the defendant was affirmed by this Court. In Gordon, this Court said:
"The negligence charged against Carr is that he `negligently drove his truck in a wide swing to the left and caused said truck to collide with the plaintiff'; that Carr failed to anticipate that said minor would run across the street and collide with Carr's truck, and that Carr was driving his truck at an excessive speed.
"Defendant, in his plea, denied he was guilty of any ... negligence, but, on the other hand, averred that Billy ran from behind another automobile and across the road immediately in front of the truck being driven by Carr, and that this action was the sole and only cause of the accident.
.....
"From the foregoing it is readily seen that the finding of the jury that Carr was guilty of no negligence producing the injury to Billy was amply supported by the testimony." 226 Miss. at 839-42, 85 So.2d at 492-93.
In my opinion, it makes no difference whether a child suddenly runs from behind a parked car into the path of an approaching car, as in Gordon, or whether a child suddenly runs from a concealed position down an embankment or behind other children, as in the case at bar. In either case the child was hidden from the view of the approaching motorist.
In Morris, by Next Friend, v. Boleware, 228 Miss. 139, 87 So.2d 246 (1956), an eight-year-old child was injured when she ran in front of a car driven by the defendant at an intersection in Jackson. The jury returned a verdict for the defendant, and we affirmed. In deciding Morris, this Court said:
"Thus the evidence for the plaintiff and the defendant presented a sharp issue of fact as to whether Boleware had his automobile under reasonable and proper control, whether he was keeping a proper lookout, whether he was operating it at a reasonable speed, whether he negligently ran a red light, and whether he negligently failed to avoid injury to the child, or whether the child suddenly ran out into the path of his car at a time when he was guilty of no negligence, and whether he thereafter did everything in his power, as a reasonably prudent man would do in like circumstances, to avoid injuring her.
"Obviously this sharply disputed issue of fact was for the determination of the jury." 228 Miss. at 144-45, 87 So.2d at 247. [Emphasis added].
In the face of our consistent holdings that the question of negligence vel non is for the jury to decide, and that unless the jury's verdict is against the overwhelming weight of the evidence we will affirm, I can't understand why in this case we ignore all of the evidence supporting the jury's verdict and hold that the defendant is liable as a matter of law, because when confronted with an emergency situation not of his making he didn't in some way completely avoid an unavoidable accident.
I would affirm the judgment of the trial court based on a jury verdict for the defendant after a full trial on all issues of negligence.
WALKER and BROOM, JJ., join in this dissent.
*497 SMITH, Presiding Justice, dissenting in part:
Whether the evidence in this case created an issue for the jury on the question of liability is, in my judgment, extremely close. In the situation reflected by the record, it is my view that a reversal upon the ground that the verdict was against the weight of the evidence is warranted. However, I consider that the facts and circumstances disclosed by the evidence require that the case be remanded for a retrial on all issues, not simply as to damages alone.